TRIZECHAHN GATEWAY LLC,
a Delaware limited liability
company

v.

Paul H. TITUS, James H. McConomy, Lindsey D. Alton, Thomas D. Arbogast, S. Link Christian, David I. Cohen, Suzanne L. DeWalt, Donald T. Dulac, Jr., Martin J. Hagan, Thomas M. Hardiman, Henry R. Johnston, III, Stephen R. Kaufman, David B. Mulvihill, David G. Oberdick, Manning J. O'Connor II, Debra M. Parrish, Adrian N. Roe, Thomas J. Santone, Mark Stadler, C. Richter Taylor, Jr., Charles B. Watkins, Thomas C. Wettach, as individuals, trading and doing business as Titus & McConomy, a Pennsylvania general partnership, also known as Titus & McConomy LLP, and Titus & McConomy, a Pennsylvania general partnership, also known as Titus & McConomy, LLP.

Appeal of Paul H. Titus, James H. McConomy, Lindsey D. Alton, Thomas D. Arbogast, S. Link Christian, Martin J. Hagan, David B. Mulvihill, David G. Oberdick, Manning J. O'Connor II, Adrian N. Roe, Mark Stadler and Thomas C. Wettach.

Trizechahn Gateway LLC, a Delaware limited liability company

v.

Paul H. Titus, James H. McConomy, Lindsey D. Alton, Thomas D. Arbogast, S. Link Christian, David I. Cohen, Suzanne L. DeWalt, Donald T. Dulac, Jr., Martin J. Hagan, Thomas M. Hardiman, Henry R. Johnston, III, Stephen R. Kaufman, David B. Mulvihill, David G. Oberdick, Manning J. O'Connor II, Debra M. Parrish, Adrian N. Roe, Thomas J. Santone, Mark Stadler, C. Richter Taylor, Jr., Charles B. Watkins, Thomas C. Wettach, as individuals, trading and doing business as Titus & McConomy, a Pennsylvania general partnership, also known as Titus & McConomy LLP, and Titus & McConomy, a Pennsylvania general partnership, also known as Titus & McConomy, LLP.

Appeal of Titus & McConomy LLP and Titus & McConomy, a Pennsylvania general partnership, also known as Titus & McConomy LLP.

Trizechahn Gateway LLC, a Delaware limited liability company,
Appellant

v.

Paul H. Titus, James H. McConomy, Lindsey D. Alton, Thomas D. Arbogast, S. Link Christian, David I. Cohen, Suzanne L. DeWalt, Donald T. Dulac, Jr., Martin J. Hagan, Thomas M. Hardiman, Henry R. Johnston, III, Stephen R. Kaufman, David B. Mulvihill, David G. Oberdick, Manning J. O'Connor II, Debra M. Parrish, Adrian N. Roe, Thomas J. Santone, Mark Stadler, C. Richter Taylor, Jr., Charles B. Watkins, Thomas C. Wettach, as individuals, trading and doing business as Titus & McConomy, a Pennsylvania general partnership, also known as Titus & McConomy LLP, and Titus & McConomy, a Pennsylvania General partnership, also known as Titus & McConomy, LLP.

Superior Court of Pennsylvania.

Argued April 10, 2007.

Filed July 3, 2007.

Reargument Denied Sept. 17, 2007.

John R. O'Keefe, Pittsburgh, for Stadler and O'Connor.

Carl A. Solano, Philadelphia, for Roe, Titus, Alton, Hagan, Christian, McConomy, Oberdick, Wettach, Arbogast and Mulvihill.

Dianna C. Wyrick, Pittsburgh, for Parrish, Hardiman and Kaufman.

Kenneth J. Witzel, Pittsburgh, for Watkins, Dulac and Johnston.

Albert J. Zangrilli, Pittsburgh, for Trizechahn Gateway.

BEFORE: ORIE MELVIN, BENDER and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Appellants, Paul Titus, James H. McConomy, Lindsey D. Alton, Thomas D. Arbogast, S. Link Christin, Martin J. Hagan, David B. Mulvihill, David G. Oberdick, Manning J. O'Connor II, Adrian N. Roe, Mark Stadler, Thomas C. Wettach, and Titus & McConomy LLP a/k/a Titus & McConomy, a Pennsylvania general partnership and law firm formerly composed of appellants and others, appeal from the $3,274,037.79 judgment entered after the trial court concluded they had breached their lease with Trizechahn Gateway LLC (Trizechahn).[1]

1. Cross-appellees Dulac, Watkins, Johnson,     DeWalt, Hardiman, Parrish, Kaufman and de-

¶ 2 Trizechahn cross-appeals from the trial court's December 16, 2002, Order granting summary judgment in favor of cross-appellees Donald T. Dulac, Jr., and Charles B. Watkins; the trial court's January 27, 2003, Order granting summary judgment in favor of cross-appellee Henry R. Johnson III; the trial court's January 29, 2003, grant of summary judgment in favor of cross-appellee Suzanne L. DeWalt; and the trial court's June 30, 2004, granting of summary judgment to cross-appellees Thomas M. Hardiman, Debra M. Parrish, and Stephen R. Kaufman.

**Relevant Background**

¶ 3 In 1995, a third-party landlord and Titus & McConomy LLP (T & M) began negotiating a lease agreement for occupation of the entire 20th floor, part of the 21st floor, and basement storage space in Four Gateway Center, located in downtown Pittsburgh. Shortly after negotiations began, the third-party landlord sold Four Gateway Center to Trizechahn. After further negotiations, T & M and Trizechahn reached an agreement and, subsequently, executed the ten-year lease agreement (master lease) that is the principal subject of this case.[2] The lease term ran from October 1, 1995, until June 30, 2005. Record, No. 187, Exhibit List, No.

1, p. 1. In June of 1998, the parties entered into a second lease (storage lease) for an additional storage space in the basement of Four Gateway Center. *Id.* at No. 2. The term of this lease ran from June 15, 1998, until June 30, 2005. *Id.*

¶ 4 In August of 1999, T & M decided to liquidate and wrap up its affairs. On August 18th of that year, appellant Titus sent a letter to Trizechahn's general manager notifying Trizechahn of the impending dissolution and offering to work towards subletting the master lease premises. Record, No. 183, Exhibit List, No. 7. A formal plan of liquidation was executed on that same date. Record, No. 187, Exhibit List, No. 59. Shortly thereafter, T & M vacated the master lease premises, but left behind files in the basement storage spaces and office fixtures in the office space. Trial Court Opinion, Friedman, J., 3/30/05, at 2. In the event of abandonment, the master lease provided as follows:

15. LANDLORD'S REMEDIES

. . .

(d) If the Tenant abandons the Premises or the Landlord otherwise becomes entitled so to elect, and the Landlord

fendants Santone and Taylor filed notice with this Court under Pa.R.A.P. 908, **Parties on Appeal,** that they had no interest in the outcome of the appeal in this case. Inasmuch as this is true, these cross-appellees and defendants are no longer parties to the appeal in this case.

Cross-appellees, as discussed *infra,* were all granted summary judgment by the trial court. The trial court concluded defendants Thomas J. Santone and C. Richter Taylor, Jr. were not liable for breaching the subject lease because both were "effectively out of the Partnership" before the lease was executed. Trial Court Opinion, Friedman, J., 03/30/05, at 21. Trizechahn does not challenge the trial court's disposition with respect to Santone and Taylor.

2. Notably, Trizechahn's director of leasing testified that the master lease was originally drafted by the third-party who sold Four Gateway Center to Trizechahn. *See N.T.,* 08/25/–04–08/26/04 at 387. The director further testified, however, that Trizechahn lawyers reviewed the master lease before it was executed and that certain terms of the original draft were changed after negotiations with T & M. *Id.* at 387–388. The bargained for changes to the master lease are evident from the face of the document. *See* Record, No. 187, Exhibit List, No. 1. The importance of these facts will become evident in our analysis.

elects, without terminating the lease, to endeavor to relet the Premises, the Landlord may, at the Landlord's option enter into the Premises, remove the Tenant's signs and other evidence of tenancy, and take and hold possession thereof as in Paragraph (c) of this Section provided, without such entry and possession terminating the lease or releasing the Tenant, in whole or in part, from the Tenant's obligation to pay the Rent hereunder for the full term as hereinafter provided. Upon and after entry into possession without termination of the lease, the Landlord may relet the Premises or any part thereof for the account of the Tenant to any person, firm or corporation other than the Tenant for such rent, for such time and upon such terms as the Landlord shall determine to be reasonable. In any such case, the Landlord may make repairs, alterations and additions in or to the Premises, and redecorate the same to the extent deemed by the Landlord necessary or desirable, and the Tenant shall, upon demand, pay the cost thereof, together with the Landlord's expenses of the reletting. If the consideration collected by the Landlord upon any such reletting for the Tenant's account is not sufficient to pay monthly the full amount of the Rent reserved in this lease, together with the cost of repairs, alterations, additions, redecorating and the Landlord's expenses, the Tenant shall pay to the Landlord the amount of each monthly deficiency upon demand.

Record, No. 187, Exhibit List, No. 1, p. 9.

¶ 5 Trizechahn immediately entered into negotiations with respective subtenants after T & M abandoned the premises. The trial court found that T & M continued to pay rent through January of 2000 when all rental payments ceased. *Id.* Over five years remained on the lease term at the time of default. In that regard, the master lease provided as follows:

15. LANDLORD'S REMEDIES

. . .

(b) If the Tenant defaults in the payment of Rent and such default continues for ten (10) days after notice, or defaults in the prompt and full performance of any other provision in this lease and such default continues for thirty (30) days after notice, or if the leasehold interest of the Tenant be levied upon under execution or be attached by process of law, or if the Tenant abandons the Premises, then and in any such event the Landlord may, at its election, either terminate the lease and the Tenant's right to possession of the Premises or, without terminating this lease, endeavor to relet the Premises. Nothing herein shall be construed so as to relieve the Tenant of any obligation, including the payment of Rent, as provided in this lease.

Record, No. 187, Exhibit List, No. 1, p. 9.

¶ 6 On February 29, 2000, Trizechahn sent a letter to T & M outlining two termination plans into which it would be willing to enter to settle T & M's outstanding obligations under the master lease, both of which called for T & M to remit payments totaling less than $1 million. Record, No. 183, Exhibit List, No. 15. The letter also indicated Trizechahn was intent on immediately recovering, at the minimum, the portion of the master lease storage space necessary to correct a building code violation and that, after said recovery, T & M's rental obligation would be reduced accordingly.[3] *Id.* T & M did not formally re-

3. For purposes of clarity, it must be noted    that the trial court found T & M was in

spond to this letter.[4]

¶ 7 On July 14, 2000, Trizechahn sent another letter to T & M notifying it that Trizechahn was attempting to relet the master lease storage space and requesting T & M to remove any miscellaneous files left in that space after the firm's abandonment. Record, No. 183, Exhibit List, No. 23. Four days later, appellant Titus replied by readily agreeing to remove the files and by requesting permission to enter the 20th floor space to remove additional files. Record, No. 187, Exhibit List, No. 50.

¶ 8 On July 28, 2000, allegedly having not yet received rental payments for March through July of 2000, Trizechahn filed a written complaint seeking all sums still due under the lease. Record, No. 1. The complaint subsequently was amended twice to add additional parties and a third time to raise a claim for re-letting and alteration expenses. Record, Nos. 18, 25, 75.

¶ 9 By August 3, 2000, T & M had vacated the storage lease space pursuant to Trizechahn's decision to terminate. Record, No. 187, Exhibit List, No. 52. Trizechahn then utilized a portion of the recovered master lease storage space and storage lease space to construct an egress from the basement of Four Gateway Center for the benefit of a new tenant. Trial Court Opinion at 12.

¶ 10 On March 18, 2001, Trizechahn re-let the 21st floor space under the master lease to Copperweld Corporation. Record, No. 187, Exhibit List, No. 8. Copperweld did not take possession of the 21st floor space, however, until March 1, 2003, and, pursuant to the terms of its lease with Trizechahn, did not begin paying rent until that time. Trial Court Opinion at 6. Copperweld took the space "as is," and Trizechahn did not, therefore, incur any expenses for re-letting this portion of the premises. *Id.*

¶ 11 By lease dated January 17, 2003, Trizechahn re-let the 20th floor space to DMJM + Harris, Inc. (DMJM). Record, No. 187, Exhibit List, No. 9. The term of the lease commenced on March 1, 2003, with the first six months of the lease term being rent free. *Id.* In re-letting the 20th floor space, Trizechahn incurred a total of $574,216.965 for repairs, alterations, additions, and redecorating of the space. Trial Court Opinion at 7.

¶ 12 On June 28, 2004, after the trial court had issued a series of Orders granting summary judgment to cross-appellees Dulac, Watkins, Johnson, DeWalt, Hardiman, Parrish, and Kaufmann, the trial court issued an Opinion outlining its rationale for dismissing these parties. Trial Court Opinion, Friedman, J., 6/28/04, at 4–6.

¶ 13 On June 27, 2005, the trial court entered the Order subject of this appeal. A few days later, all of the defendants filed a joint motion for post-trial relief seeking,

default under the storage lease at the time Trizechahn sent the February 29, 2000, letter. Trial Court Opinion at 9. The storage lease provided that all of the remedies outlined in the master lease were available to Trizechahn with respect to the storage lease as well. Record, No. 187, Exhibit List, No. 2, Storage Lease. Consequently, the master lease provisions outlined above governed T & M's default on both the master and storage leases, giving Trizechahn the unfettered right to enter into

the storage lease premises for re-letting as well.

4. Subsequently, Trizechahn sent a second letter dated March 30, 2000, notifying T & M that they had failed to remit rental payments for February and March of 2000. Record, No. 183, Exhibit List, No. 16. The letter stated Trizechahn would forego adding interest or penalty charges to the outstanding balance as a professional courtesy. *Id.*

in relevant part, a modification of the amount of damages awarded. Record, No. 135. The trial court denied the motion in part by Order of May 30, 2006, but also granted the motion in part by reducing the interest award. Record, No. 148. The court entered an additional Order on June 6, 2006, amending its prior Order by accurately outlining which defendants were to be held individually liable.

¶ 14 Appellants responded by perfecting this timely appeal.[5] Trizechahn then perfected its timely cross-appeal. The trial court ordered both appellants and Trizechahn to file statements of matters complained of on appeal. *See* Pa.R.A.P. 1925, **Opinion in Support of Order,** (b) **Direction to file statement of matters complained of.** Thereafter, the trial court issued an Opinion which referred the disposition of the various issues raised back to a prior Memorandum issued by the court on May 30, 2005. Record, No. 181.

¶ 15 Although the operative factual nucleus of the appeal and cross-appeal is clearly intertwined, the legal issues raised by the appeal vary significantly in comparison with the legal issues raised in the cross-appeal. As such, we will analyze the appeals and cross-appeal separately.

**1050 WDA 2006 and 1091 WDA 2006**

¶ 16 Appellants raise the following issues for our review:

1. Is a commercial tenant entitled to judgment in its favor in a landlord's breach-of-contract action because the landlord's misrepresentations, duress, and other misconduct breached a duty of good faith and fair dealing owed to the tenant?

2. Does a commercial landlord terminate the lease of a tenant that has dissolved and abandoned the leased premises, where the landlord (a) unilaterally re-takes a portion of the leasehold for itself, and (b) demolishes and transfers to other tenants the remaining portions of the premises?

3. Where a lease drafted by the landlord absolves from personal liability any partner signing the lease as a representative of the partnership lessee, and where the landlord does not obtain guarantees or seek financial information from the individual partners, are the individual partners personally liable if the partnership breaches the lease?

4. In an action for breach of lease: (a) Is a commercial landlord required to mitigate damages for unpaid rent where the lease does not convey an estate in land and requires the landlord to endeavor to re-let the premises if it does not elect to terminate the lease?

(b) Is a landlord entitled to recover from its former tenant (i) the costs of demolishing that tenant's leased premises, (ii) damages for a six-month period in which a new tenant occupies the former tenant's leased premises without paying rent, (iii) prejudgment interest on an entire award of unpaid rent from the date of the tenant's initial breach, despite the absence of an acceleration clause in the lease, and (iv) counsel fees, despite a clause in the lease limiting fees to those needed for situations other than non-payment of rent?

Appellants' brief at 3.

¶ 17 Appellants O'Connor and Stadler, who join in the issues outlined above, also filed a separate brief raising the following issue: Are Individual Defendants O'Connor and Stadler liable to the Landlord?

---

5. T & M filed a notice of appeal that was separate from the one filed for the other appellants in their respective individual capacities. Record, Nos. 150, 151. This Court later consolidated these appeals with Trizechahn's cross-appeal on July 10, 2006.

O'Connor and Stadler brief at 3; *see also* 15 Pa.C.S.A. § 8329, **Liability of incoming partner.**

## A. Applicable Standard and Scope of Review

■ ¶ 18 Generally speaking, our standard of review over a non-jury verdict requires us to determine whether the trial court committed an error of law and whether the trial court's findings of fact are supported by competent evidence of record. *Rissi v. Cappella*, 918 A.2d 131, 136 (Pa.Super.2007). Our scope of review requires us to review the factual findings of the trial court with deference and to consider the evidence of record in a light most favorable to the verdict winner. *Id.*

¶ 19 Appellants, anticipating the critical role our scope of review will play in determining the success of their fact intensive arguments, contend that our usual deference to the factual findings of the trial court is unwarranted in this case because "the trial court's findings merely adopted the submissions of Trizechahn" and, hence, were not "independently made." Appellant's brief at 32, n. 10, *citing Commonwealth v. Kratsas*, 564 Pa. 36, 67 n. 24, 764 A.2d 20, 38 n. 24 (2001); *In the Interest of A.L.D.*, 797 A.2d 326, 341 n. 6 (Pa.Super.2002). Trizechahn, on the other hand, contends the trial court's factual findings do not constitute the sort of "wholesale adoption" of one litigant's factual position that was admonished in *Kratsas*.

¶ 20 Appellants fail to point to evidence, such as a pre-trial submission, memorandum, or brief upon which the trial court relied in allegedly adopting Trizechahn's rendition of the facts in a wholesale fashion. Accepting appellants' bald allegation that the trial court engaged in such wholesale adoption would lead this Court down a road upon which it is unwilling to take. While we recognize the wisdom in scruti-

nizing a wholly adopted factual account more intensively than a factual account arrived at by objective examination, we would be remiss if we were to step out of our appellate role solely on the basis of unsubstantiated assertions by litigants. In this instance, therefore, we will faithfully adhere to our scope of review and review the trial court's factual findings with deference, although we will not hesitate to upset such findings should they prove unsupported by competent evidence of record. *Rissi, supra* at 136.

## B. Duty of Good Faith and Fair Dealing

¶ 21 Turning now to the substantive issues raised, appellants contend Trizechahn breached a duty of good faith and fair dealing when it notified appellants, by the February 29, 2000, letter discussed *supra,* that it needed to retake the master lease storage space in order to correct a building code violation. Appellants contend that Trizechahn, prior to sending this notice, already had decided to take back the space so that it could commit it to a new tenant for purposes of building an egress. This misrepresentation, appellants contend, stripped them of information that could have been used as leverage in buyout negotiations. Appellants further contend Trizechahn breached a duty of good faith and fair dealing by obstructing appellants' efforts to re-let the abandoned space. Appellants maintain that once Trizechahn breached its duty, appellants were excused from further performance under the lease.

■ ¶ 22 In Pennsylvania, lease agreements are governed by contract law and general contract law principles. *Lehn's Court Mgmt., LLC v. My Mouna, Inc.*, 837 A.2d 504, 510–511 (Pa.Super.2003), *citing Amoco Oil Co. v. Snyder*, 505 Pa. 214, 220, 478 A.2d 795, 798 (1984). As such, when the language of a lease is

clear and unequivocal, its meaning will be determined by its contents alone in ascertaining the intent of the parties. *See Seven Springs Farm v. Croker,* 569 Pa. 202, 801 A.2d 1212, 1215 (2002). Every contract imposes a duty of good faith and fair dealing on the parties in the performance and the enforcement of the contract. *John B. Conomos, Inc. v. Sun Co.,* 831 A.2d 696, 705–706 (Pa.Super.2003), *citing* **Restatement (Second) of Contracts § 205, Duty of Good Faith and Fair Dealing** (other citations omitted).

¶ 23 Appellants do not attack the trial court's finding that they were in default on the master lease when Trizechahn sent notice of its intent to retake the master lease storage space. They also do not contend that the lease language is ambiguous. *See Croker, supra* at 1215. Thus, the trial court's conclusion that the lease language allowed Trizechahn to enter into the master lease storage space and alter the space without terminating the lease must stand. *See* Record, No. 187, Exhibit List, No. 1, 15. Landlord's Remedies ¶ (d), p. 9. ("If the Tenant abandons the Premises or the Landlord otherwise becomes entitled so to elect, and the Landlord elects, without terminating the lease, to endeavor to relet the Premises, the Landlord may ... make repairs, alterations and additions in or to the Premises, and redecorate the same to the extent deemed by the Landlord necessary or desirable....").

¶ 24 The question to be answered with respect to appellants' first issue, therefore, is whether Trizechahn's assertion that it needed to retake the storage space to correct a building code violation, coupled with Trizechahn's alleged obstruction to re-letting the property, constituted a violation of the duty of good faith. We conclude that it did not.

¶ 25 Trizechahn's notice that it needed to retake the master lease storage space was, in the first instance, immaterial. Once appellants defaulted on the master lease, Trizechahn was entitled to enter the premises and make the alterations it felt necessary to allow the space to be re-letted. As a consequence, even if appellants had known about Trizechahn's impending plan to use the master lease storage space to create an egress for a new tenant, they would have not had any greater leverage in settlement negotiations because Trizechahn was entitled to alter the master lease storage space as a matter of right.[6] Furthermore, after Trizechahn's right to enter and re-let the premises vested, Trizechahn was free to use the space as it saw fit. In exercising this right, Trizechahn concluded that it needed to correct a potential building code violation to appease a new tenant. We do not find this sequence of events evinces a breach of the covenant of good faith and fair dealing.

¶ 26 We also find appellants' allegations of obstruction to be of no merit. After a painstaking review of over 85 exhibits submitted into evidence by appellants in conjunction with the trial transcript, we conclude there is no evidence to substantiate their contention that Trizechahn refused to re-let the master lease space to a prospective tenant secured by appellants. In fact, the earliest mention in these exhibits of appellants taking *any* affirmative action to re-let the space was a letter from appellant Titus to Trizechahn dated June 24, 2002, over two years after the original

---

6. We recognize that this conclusion would be on tenuous ground if we were to find that a general rule existed whereby anytime a landlord alters or interferes with a portion of a leasehold the entire lease is terminated. Such a general rule, however, does not exist in this Commonwealth. *See infra.*

default, in which Titus states that appellants are "in the process of concluding discussions" with a leasing agent. Record, No. 183, Exhibit List, No. 42. There is no evidence contained in these exhibits that shows appellants actually presented a prospective lessee to Trizechahn who was rejected. Appellants also failed to offer testimony from a leasing broker or rejected potential lessee to substantiate their contention.

¶ 27 We conclude no evidence of record exists to warrant a finding that Trizechahn breached its duty of good faith and fair dealing and, therefore, appellants were not relieved from further performance due to the alleged breach.

## C. Breach of the Covenant of Quiet Enjoyment and/or Surrender of the Master Lease

¶ 28 Appellants' second issue concerns the legal implications of Trizechahn's alteration, demolition, and reconstruction of both the master lease storage space and the 20th floor space. Appellants' initial contention is simple—Trizechahn's decision to take back the master lease storage space "constituted an eviction from and termination of the entire lease," which relieved appellants of further performance. Appellants' brief at 39, *citing Kelly v. Miller*, 249 Pa. 314, 94 A. 1055, 1056 (1915).

¶ 29 Appellants further contend that although Trizechahn was permitted to make alterations necessary for re-letting the master lease space, it was permitted to do so "*only* if the re-letting is done in a way that is not hostile to the first lease and creates an estate that is subordinate to and consistent with that of the original tenant." *Id.* at 46, *citing Jenkins v. Root*, 269 Pa. 229, 112 A. 153, 154 (1920). According to appellants' argument, inasmuch as Trizechahn re-let the master lease space in a way that was hostile to appel-

lants, Trizechahn accepted appellants' surrender of the master lease and relieved them of their obligations. Appellants' brief at 46, *citing Brill v. Haifetz*, 158 Pa.Super. 158, 44 A.2d 311, 313 (1945).

■ ¶ 30 Turning first to Trizechahn's alleged breach of quiet enjoyment, appellants' reliance on the principal espoused in *Kelly* is misplaced. *Kelly* advances the proposition that every lease in this Commonwealth contains an implied covenant of quiet enjoyment that cannot wrongfully be disturbed by a landlord without termination of the lease arrangement. *See e.g., Lichtenfels v. Bridgeview Coal Co.*, 366 Pa.Super. 304, 531 A.2d 22, 25 (1987) ("There is an implied covenant of quiet enjoyment in every lease of real property.... It is breached when the lessee's possession is impaired either by acts of the lessor or those acting under the lessor or by the actions of a holder of superior title. Any 'wrongful act' of the lessor that interferes with the lessee's possession, in whole or in part, is a breach of the covenant of quiet enjoyment.") (citations omitted); *see also Kohl v. PNC Bank National Association*, 590 Pa. 151, 168, 912 A.2d 237, 248–249 (2006). The covenant of quiet enjoyment is defined as: 1. A covenant insuring against the consequences of a defective title or any other disturbance of the title. 2. A covenant ensuring that the tenant will not be evicted or disturbed by the grantor of a person having a lien or superior title. **Black's Law Dictionary** 392 (8th ed.2004), *accord Lichtenfels, supra* at 25.

¶ 31 After appellants defaulted on the master lease and abandoned the master lease space, Trizechahn was entitled to take possession of the master lease storage space and make the alterations it deemed necessary to re-let the space. Once appellants defaulted and abandoned the premises, they relinquished possession and, therefore, they had no possession which

could be disturbed.[7] As such, Trizechahn did not evict or disturb appellants' enjoyment of the master lease space and, therefore, could not have committed a "wrongful act" that would give rise to a breach of the covenant of quiet enjoyment. *See Kohl, supra* at 251, *citing Kelly, supra* at 1055.

¶ 32 Turning to Trizechahn's alleged acceptance of surrender, appellants' reliance on *Jenkins* and *Brill* is similarly misplaced. In *Jenkins,* our Supreme Court delineated the concept of a "hostile" second lease or re-letting by contrasting it with that of a "beneficial" second lease or re-letting as follows:

> Care must be taken to distinguish cases in this State where it has been held that a second lease may exist for the same premises and for the same term. Where the first lessee, without right, abandons the possession, the landlord may resume possession and rent or repair the property, in the interest of the first tenant, who remains liable for any defalcation or deficiency in the rent, and the joinder of the first lessee in securing another tenant will not work a surrender in law unless the owner agrees thereto. Such leases are not the creation of independent and inconsistent estates, but are dependent and consistent estates for the benefit of the original lessee, though taken in the name of the lessor owner; and while the ordinary incidents of landlord and tenant may not be exercised as against the second lessee under the first lease such as distraint, yet the duty, under the first lease, to pay periodically a certain sum of money, survives through its covenants, conditions and powers, relieved only when paid under the second lease, which is in aid of the first. The creation of two independent estates by the same lessor in hostility to each other, accepted by the first, terminates the relation of landlord and tenant under the first agreement and abrogates and annuls all the terms and conditions therein expressed.

*Jenkins,* 269 Pa. at 232–33, 112 A. at 154 (citations omitted).

■■ ¶ 33 In this instance, appellants admittedly surrendered the master lease premises. Trizechahn can only be deemed to have accepted a surrender of the lease if it agreed to do as much. *Id.* at 154. The burden of proving a lessor's acceptance of surrender is on the lessee. *Brill, supra* at 313. The question of whether a landlord has accepted surrender of a lease is one of fact; to prove surrender a lessee must produce convincing evidence that the lessor committed an "unequivocal act" constituting acceptance of the lessee's surrender. *Stonehedge Square Limited Partnership v. Movie Merchants,* 454 Pa.Super. 468, 685 A.2d 1019, 1023 (1996), *affirmed on other grounds,* 552 Pa. 412, 418, 715 A.2d 1082, 1085 (1998).

■ ¶ 34 Appellants contend Trizechahn's decision to re-let the 20th floor space to DMJM by granting them the first six months rent free coupled with Trizechahn's decision to extend the terms of the 20th and 21st floor re-let leases past the terms stated in the master lease constitutes convincing evidence of Trizechahn's unequivocal acceptance of appellants' surrender.

¶ 35 The trial court implicitly concluded that Trizechahn's decision to give DMJM a six month grace period on the lease was a commercially reasonable inducement offered to DMJM when the local commercial real estate market was in a state of de-

---

7. Appellants never attempted to cure their default and re-take the master lease premises, nor did they ever indicate that they were interested in doing so. Eventually, T & M's liquidation made any potential for repossession a nullity.

cline. *See N.T.*, 8/25/04–8/26/04, at 361–362; *see also* Trial Court Opinion, Friedman, J., 3/30/05, at 17 (crediting testimony offered by Trizechahn's director of leasing concerning the state of the local real estate market in 2003). We will not disturb this conclusion as it is supported by credible and competent evidence of record. *Rissi, supra* at 136. There is, however, no evidence of record demonstrating this inducement also functioned as unequivocal acceptance of appellants' surrender. Additionally, our Supreme Court has given a strong indication that when a landlord enters into a second lease that contains a longer term than the first lease that is in default, this fact is insufficient to establish acceptance of surrender. *Brill, supra* at 313 ("It is true that in *Rafferty v. Klein,* 256 Pa. 481, 486, 100 A. 945, 947, which involved the sufficiency of an affidavit of defense, the court said that the second lease 'extending far beyond the expiration of the original term' prevented a recovery for loss of rent by the landlord from the date of the second lease. That observation, however, was not necessary to the court's decision.").[8]

¶ 36 In summation, appellants fail to demonstrate a breach of the covenant of quiet enjoyment or an acceptance of surrender that would have relieved them from further performance under the master lease.[9]

---

8. The propriety of such an indication will become more evident after consideration of the foregoing analysis. As discussed *infra,* commercial landlords have no duty to mitigate their damages. It would be logically inconsistent to punish a landlord by stripping him or her of the benefit of the bargain for re-letting a premises, to the benefit of the breaching lessee, by concluding acceptance of surrender has taken place simply because the landlord entered into a subsequent lease with a longer term—a transaction which is both economically efficient as a general matter and beneficial to the landlord as a specific matter.

## D.  Absolution Clause

■ ¶ 37 Appellants next contend the plain and unambiguous language of the master lease shows the lease was non-recourse in nature and, therefore, the trial court erred in imposing liability on the general partners as individuals under the lease. *See generally,* 15 Pa.C.S.A. § 8327(2), **Nature of liability of partner.** Appellants point to the following clause in the master lease to bolster this contention:

28.  SPECIAL STIPULATIONS

. . .

(i) In the absence of fraud, no person, firm or corporation, or the heirs, legal representatives, successors and assigns, respectively, thereof, *executing this lease as agent, trustee or in any other representative capacity* shall ever be deemed or held individually liable hereunder for any reason or cause whatsoever.

Record, No. 187, Exhibit List, No. 1, 28. Special Stipulations ¶ (i), p. 12. (emphasis added).

■ ¶ 38 Inasmuch as the lease must be construed according to general principles of contract law, we are mindful that the primary objective in construing a contract is to effectuate the intentions of the parties. *Croker,* 801 A.2d at 1215.

---

9. Appellants also contend Trizechahn's damages were limited to an amount equal to the present value of the rent called for in the lease minus the present fair rental value of the premises as outlined in paragraph 15(f) of the master lease. This damage equation, however, was only applicable in the event that Trizechahn terminated the lease, which, as our disposition of the first two issues raised by appellants indicates, we conclude it did not do.

When language in a contract is unambiguous, its meaning must be discerned from the contents of the words alone. *Id.*

¶ 39 On one hand, appellants assert this clause unambiguously absolves all partners from individual liability while Trizechahn, on the other hand, contends the clause unambiguously indicates that only real estate brokers, attorneys, and other agents who execute the lease on behalf of another will be able to avoid individual liability.

¶ 40 We conclude the clause plainly indicates the absolution of liability only pertains to those persons or entities "executing this lease *as* agent, trustee or in any other representative capacity." Record, No. 187, Exhibit List, No. 1, 28. Special Stipulations ¶ (i), p. 12 (emphasis added). In this respect, therefore, we concur with Trizechahn's reading of the clause. Appellants Arbogast and Wettach are the only two appellants this clause conceivably could protect, therefore, as they executed the lease on behalf of T & M. The question is whether the clause protects Arbogast and Wettach in their individual capacities as well as in their representative capacities. The clause provides that any person or entity acting in a representative capacity cannot be held *"individually"* liable hereunder for *any* reason or cause *whatsoever."* *Id.* (emphasis added).

¶ 41 It seems as though this phrase could be read as providing absolution from liability for a person or entity acting as a representative in their representative and/or individual capacities. Both readings are plausible.[10] The latter part of the clause, therefore, is ambiguous as a matter of law with respect to the question of whether Arbogast and Wettach are absolved from liability by virtue of representing T & M when executing the master

lease. *See e.g., Lang v. Meske,* 850 A.2d 737, 740 (Pa.Super.2004) ('A contract is ambiguous if it is reasonably susceptible of different constructions and is capable of being understood in more than one sense.' *Quoting Osial v. Cook,* 803 A.2d 209, 213–214 (Pa.Super.2002) (citations omitted)).

■ ¶ 42 At some point during the proceedings below, appellants attempted to offer parol evidence to aid the trial court in discerning the meaning of the absolution clause. *See* Pa.R.A.P. 1925(a) Opinion, Friedman, J., 7/28/06, at 8–9, *citing* Trial Court Opinion, Friedman, J., 8/12/04, at 2. This offer was denied based on the trial court's bald conclusion that the absolution clause was unambiguous as a matter of law. *Id.* While this denial seemingly constituted an error of law on its face, the unconventional history of the master lease leads us to the conclusion that it was not—setting aside for a moment the fact that the trial court's ultimate interpretation of the absolution clause was in error.

¶ 43 As discussed above, the master lease was not originally drafted by any of the parties to this dispute. *See* Note 2, *citing N.T.,* 8/25/04—8/26/04 at 387–388. In addition, the master lease does not indicate that the absolution clause was one of the provisions altered after negotiation between the parties. *See id.* It would, therefore, be a misnomer to speak of Trizechahn's "intent" in drafting the absolution clause because Trizechahn *did not draft the clause.* Consequentially, admitting parol evidence of Trizechahn's intent would be a pointless exercise—although Trizechahn would undoubtedly assert that it intended to hold Arbogast and Wettach individually liable in the event the master lease was defaulted upon, such an asser-

---

**10.** While it may seem the absolution clause is not susceptible to two different readings as it would make little sense for Trizechahn to release any of the individual partners from liability, non-recourse leases are frequently executed in the real estate market.

tion would be disingenuous at best. Given the situation, therefore, the only parol testimony that could conceivably be given any credit would be offered by Arbogast and Wettach.

¶ 44 We conclude, therefore, that the absolution provision operates to insulate appellants Arbogast and Wettach from individual liability in this case. Our parol evidence analysis is bolstered by the language of the absolution clause itself, which provides that no person acting as a representative shall be held "individually" liable for "any reason or cause whatsoever." Record, No. 187, Exhibit List, No. 1, 28. Special Stipulations ¶ (i), p. 12. This broad language tends to favor the reading advocated by Arbogast and Wettach and, hence, is the more plausible reading as a matter of law.

¶ 45 Aptly anticipating the possibility that this Court would conclude the absolution clause is ambiguous, thereby raising the potential for Arbogast and Wettach to be absolved, appellants point to *Singer v. Ritter*, 167 Pa.Super. 154, 74 A.2d 520 (1950), for the broader proposition that "by releasing the executing partners, Trizechahn released all of the T & M partners as a matter of law." Appellants' brief at 55.

¶ 46 We disagree with this interpretation of *Singer*. The obligation at issue in *Singer* was owed by a defendant in an individual capacity, *and not by a partnership*. This Court determined that obligee's release of one of the obligors, who was also, as fortune would have it, a member of a partnership entered into with the defendant, released the defendant from joint liability but not several liability. *Id.* In reaching this determination, we relied on the Restatement of Contracts §§ 121(1) and 123 for the proposition that a promisee's decision to release a joint promisor constitutes a release of all other joint promisors. *Id.*

¶ 47 This case is readily distinguishable. Appellants' liability arises by operation of a statute that governs obligations owed by *partnerships*, not by operation of each appellant's individual agreement to be held jointly and/or severally liable under the master lease. *See* 15 Pa.C.S.A. § 8327(2) *supra* ("All partners are liable: ... (2) Jointly for all other debts and obligations of the partnership but any partner may enter into a separate obligation to perform a partnership contract.").

¶ 48 Further, we cannot, in good conscience, hold that *Singer*, which was handed down prior to the enactment of section 8327(2), allows us to interpret the absolution clause in a manner that releases all of the appellants from individual liability. The unambiguous portion of the clause, as discussed above, provides that only partners acting in a representative capacity are released from liability in their representative capacities and, for purposes of this discussion, in their individual capacities. Thus, to apply *Singer* would require us to treat the language of the ambiguous portion of the absolution clause as dispositive in the face of unambiguous language to the contrary contained within the same clause in order to defeat a clear statutory mandate that did not exist when *Singer* was decided. We cannot do so.

¶ 49 In conclusion, we reiterate that the master lease absolution clause absolves appellants Arbogast and Wettach from personal liability. The absolution clause does not, however, absolve the other appellants from individual liability—either on its face or by operation of common law.

## E. Damages

¶ 50 Appellants' next issue is comprised of arguments leveling attacks on the various components of the trial court's damage

award—the rental payments due under the master lease, demolition and re-letting expenses, foregone re-letting revenue, prejudgment interest, and counsel fees, respectively.

¶ 51 *a. Duty to Mitigate?* Appellants contend that the master lease was, in essence, nothing more then a contract governed by common law contract rules as evinced by the following clause:

20. NO ESTATE IN LAND

This contract and lease shall create the relationship of landlord and tenant between Landlord and Tenant; no estate shall pass out of Landlord; and Tenant has only a usufruct which is not subject to levy and sale.

Record, No. 187, Exhibit List, No. 1, p. 11.

■■ ¶ 52 Appellants contend that because the master lease is merely a contract, the common law rules of mitigation apply, giving rise to a duty on Trizechahn's part to re-let the master lease space as promptly as possible if, as we concluded above, Trizechahn did not terminate the lease as evinced by the language in paragraph 15(b) which provides: "[I]in any such event the Landlord may, at its election, either terminate the lease and the Tenant's right to possession of the Premises or without terminating this lease, endeavor to relet the Premises." Record, No. 187, Exhibit List, No. 1, 15. Landlord's Remedies, ¶ (b), p. 9.

¶ 53 A usufruct, an archaic creature derived from Roman law, is defined as: "A right to use and enjoy the fruits of another's property for a period of time without damaging it or diminishing it, although the property might naturally deteriorate over time." **Black's Law Dictionary** 1580 (8th ed.2004). Three forms of usufructs have been recognized in this country—the natural profits produced by the subject premises, such as timber and natural resources; the industrial profits produced by cultivating the subject premises, such as crops and grain; and any civil profits derived from the subject premises, such as rents. 28 American Jurisprudence 2d *Estates* § 6 (2007), *citing Marshall v. Marshall,* 735 S.W.2d 587, 599 (Tex.App.1987). In the modern legal system, therefore, a usufruct has become analogous to a life estate. **Black's Law Dictionary,** *supra* at 1580, *citing* La. Civ.Code. Ann. art. 535, **Usufruct.** The sparse discussion of usufructs in this Commonwealth's case law is in accordance with the general modern conception of what usufructs are. *See e.g., Hummel v. McFadden,* 395 Pa. 543, 150 A.2d 856, 859 (1959) (referring to a usufruct as "dominion over the subject matter," specifically coal); *Holman's Appeal,* 24 Pa. 174, 177–178 (1854) ("A life estate in personal property is now regarded as in many respects analogous to the usufruct of movables under the civil law."); *Wilhelm v. Folmer,* 6 Pa. 296, 299 (1847) (comparing the legal ownership a trust beneficiary has in the trust corpus with the legal ownership interest the beneficiary of a usufruct has; the former has a legal interest, while the latter does not).

¶ 54 Trizechahn asserts that the purpose of the master lease usufruct provision is "to ensure that Defendants' creditors cannot execute on Defendants' interest in the leases premises." Trizechahn brief at 33–34. After careful consideration, we conclude the no mitigation principle announced by our Supreme Court in *Stonehedge, supra,* controls.

¶ 55 While we do not dispute that Trizechahn intended the usufruct provision to insulate it from the attachment of the leasehold by appellants' creditors who could then re-let the interest to a third-party undesirable to Trizechahn, we also are cognizant that structuring a lease transaction as a usufruct potentially allows

for Trizechahn to present a more favorable priority scheme to lenders who would be more willing to grant non-purchase money mortgages on Gateway Center free of the encumbrances presented by long term leases held by lessees that are undesirable to a lender. *See generally,* 68 P.S. § 342, **When right paramount to right of purchaser** (providing that a lease will survive a judicial foreclosure sale when the lease was executed prior to the entry of the foreclosure judgment and prior to the recording of the instrument giving the foreclosure sale purchaser title, provided the lessee had no knowledge of the foreclosure judgment).

¶ 56 What Trizechahn attempted to do with the usufruct provision was to have the protections of lease law (i.e., no duty to mitigate) while simultaneously attempting to eliminate the potential detriments of having the transaction treated as a lease subject to lien law. The question thus becomes whether the substance of the master lease more closely resembles a lease or whether it more closely resembles a usufruct. If it is the former, the substance of the lease controls the form name "usufruct," and there is unquestionably no duty to mitigate. *Stonehedge,* 552 Pa. at 416, 715 A.2d at 1084. If it is the latter, the substance of the usufruct is in accordance with the form name "usufruct," giving rise to a *possible* duty to mitigate.[11] We conclude the former characterization is most appropriate.[12]

¶ 57 The *sina que non* of a lease is that the lessee obtains the right to "use and occupy" a property and, thus, obtains a leasehold interest in the subject property. **Black's Law Dictionary** 907, 909–910 (8th

**11.** The Supreme Court in *Stonehedge Square Limited Partnership v. Movie Merchants,* 552 Pa. 412, 715 A.2d 1082, 1084 (1998), noted that when "certain aspects of leases are controlled by the law of contracts and that insofar as the law of contracts is applicable, the non-breaching party must mitigate its damages." The import of this statement, however, is unclear given the Court's subsequent holding.

As is noted above, leases are governed by the law of contracts. *Amoco Oil Co. v. Snyder,* 505 Pa. 214, 478 A.2d 795, 798 (1984) ("[A] lease is in the nature of a contract and is controlled by principles of contract law."), quoting *Ezy Parks v. Larson,* 499 Pa. 615, 454 A.2d 928, 934 (1982). The *Stonehedge* Court held, as a matter of law, that commercial landlords have no duty to mitigate when a tenant abandons premises in violation of the subject lease. It is virtually impossible to imagine a situation in which a transaction, purporting to be a lease, is actually characterized as a contract wherein the promisee abandons premises and the promisor is then forced to mitigate. If such a situation were to arise, however, this Court would be faced with a significant problem if asked to apply the *Stonehedge* Court's literal statement. Initially, to do so would create inconsistency in the law based on nothing more then semantic distinctions. Secondly, many of the reasons the *Stonehedge* Court advanced for applying the no mitigation principle to commercial leases—namely, simplicity, conformance with the Landlord Tenant Act, predictability, and fundamental fairness—would all be implicated in such a scenario.

Even if we were to accept appellants' characterization of the master lease as a usufruct and not a true lease, it by no means is a certainty that we would then apply the common law mitigation principle to the usufruct. In any event, due to our disposition of this appeal, we leave the question for another day.

**12.** If this Court were confronted with a situation where a third-party creditor was attempting to lease the master lease space it had attached to another lessee, we would construe the lease against Trizechahn and allow for the creditor to re-let in order to satisfy the debt it held. Similarly, we would also hold that a foreclosure sale purchaser, more specifically a lender foreclosing on a non-purchase money mortgage, would take subject to existing commercial leases on the Gateway Center. In other words, in all contexts we would apply the substance over form doctrine to defeat Trizechahn's characterization of the master lease as a usufruct.

ed.2004). The *sina que non* of a usufruct, on the other hand, is that the usufructee obtains a right to the stream of products and/or revenues yielded by the subject property without obtaining an interest therein. *Id.* at 1580; *accord,* 28 Am.Jur.2d *Estates* § 6 (2007), *citing Marshall, supra* at 599. Admittedly, the distinction between a lease and a usufruct can be razor thin in certain circumstances. Yet, there is a historical and conceptual distinction between these transactions that should be upheld. For example, we would not permit a usufructee, who had entered into a lawful agreement to obtain the right to harvest corn on a certain portion of a farmer's tract of land to then enter the farm and take possession of the corn field simply because the governing document referred to itself as a lease.

¶ 58 In the matter *sub judice,* appellants clearly *did not* bargain for a right to the stream of products and/or revenues produced by the master lease space. They *did* unquestionably bargain for the right to use and occupy the master lease space. *See generally,* Record, No. 187, Exhibit List, No. 1. The substance of the transaction, therefore, is a lease arrangement— not a usufruct. Moreover, the master lease repeatedly refers to itself as "this lease." *See e.g.,* Record, No. 187, Exhibit List, No. 1 at ¶¶ 1, 5, 6, 7, 9, 10, 11, 13, 14, 15, 16, 17, 18, 20, 21, 23, 27, 28. Accordingly, we must treat the master lease as a lease. *See Frank Lyon Co. v. United States,* 435 U.S. 561, 572–573, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) ("[A] transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred.") (citations omitted).[13] As a consequence of this characterization, the *Stonehedge* no mitigation principle is applicable. *Id.* at 416, 715 A.2d at 1084.

¶ 59 b. *20th Floor Demolition and Reconstruction Costs.* Appellants contend the trial court erred in awarding Trizechahn $242,893.77 plus interest as appellants' costs of re-letting the 20th floor space to DMJM because Trizechahn was not entitled to demolish and re-let the premises for its own purposes.

¶ 60 The master lease provides:

15. LANDLORD'S REMEDIES

. . .

(d) If the Tenant abandons the Premises or the Landlord otherwise becomes

---

13. The substance over form doctrine was developed by federal courts to deal with tax shelters. We feel the principles of this doctrine can be imported to other transactional contexts.

We realize that appellants could raise the argument that the master lease is ambiguous as to whether it is a lease or a usufruct and that this ambiguity requires a remand for purposes of introducing parol evidence which, in this context, creates the potential for the master lease to be considered a usufruct that could, potentially, have vested Trizechahn with the duty to mitigate. *See e.g., Trombetta v. Raymond James Fin. Servs.,* 907 A.2d 550, 558–559 (Pa.Super.2006) ("Further, when an ambiguity in a contract exists, courts are free to construe the contract against the drafter and consider extrinsic evidence in so doing."), *citing In re Estate of Blumenthal,* 812 A.2d 1279, 1286 (Pa.Super.2002). The problem with this argument, however, is that a clause can only be considered ambiguous if it is "reasonably susceptible to different constructions and capable of being understood in more than one sense." *J.W.S. Delavau v. E. Am. Transp. & Warehousing,* 810 A.2d 672, 681–682 (Pa.Super.2002), *quoting Madison Const. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 606, 735 A.2d 100, 106 (1999). Terms in an agreement can only be considered ambiguous when considered in conjunction with the underlying facts of the case. *Id.* In this case, it would be completely unreasonable to consider the use of the word "usufruct" as creating ambiguity when there is no question that the substance of the underlying transaction is in the form of a lease.

entitled so to elect, and the Landlord elects, without terminating the lease, to endeavor to relet the Premises ... the Landlord may make repairs, alterations and additions in or to the Premises, and redecorate the same *to the extent deemed by the Landlord necessary or desirable....*

Record, No. 187, Exhibit List, No. 1 at ¶ 15(d), p. 9 (emphasis added).

¶ 61 Appellants do not dispute that they abandoned the 20th floor space, nor do they dispute that they defaulted on the master lease—either of which gave Trizechahn the right to begin altering the space. Appellants also do not dispute that they are liable for any costs associated with re-letting this space. They do dispute, however, the necessity in demolishing the entire 20th floor and point out that the only reason Trizechahn performed this total demolition was to effectuate asbestos removal.

¶ 62 The trial court, in calculating appellants' liability for the 20th floor restoration, subtracted $174,022 from a total cost of $835,992.03 in an attempt to ensure appellants were not unfairly saddled with asbestos abatement expenses. Trial Court Opinion, Friedman, J., 3/30/05, at 19–20, 8.

■ ¶ 63 Appellants seemingly are contending, albeit baldly, that none of the restoration costs would have been necessary had the asbestos abatement not been performed. There is a fatal flaw in this contention, however, as it is impossible for this Court to substantiate it given our review of a cold record, especially given appellants' failure to point to any evidence of record to substantiate their contention. As such, we will not review this contention further and we uphold the trial court's method of allocating costs. *Rissi, supra* at 136.

■ ¶ 64 c. *The DMJM Lease.* Appellants next contend the trial court erred when it did not credit them with six months of rental payments due to the fact that Trizechahn entered into a lease with DMJM giving them six months occupancy at not cost. Once again, we must disagree.

¶ 65 As an initial matter, Trizechahn had no duty to mitigate, as is discussed at length above. *Stonehedge, supra* at 1084. If Trizechahn did choose to re-let the master lease space, however, it was entitled to do so "for such rent, for such time and upon such terms as the Landlord shall determine, to be reasonable." Record, No. 187, Exhibit List, No. 1 at 15. Landlord's Remedies, ¶ (d), p. 9. In addition, the trial court found as fact that the decision to offer DMJM free occupancy for six months was a reasonable commercial inducement. *See N.T.,* 8/25–26/04, at 362; *see also* Trial Court Opinion at 17 (crediting testimony offered by Trizechahn's director of leasing concerning the state of the local real estate market in 2003 as credible). In summation, the trial court, by making an independent determination of the reasonableness of Trizechahn's conduct, afforded appellants a layer of protection not granted by the master lease itself. We will not disturb the trial court's decision in this regard.

■ ¶ 66 d. *Prejudgment Interest.* Appellants next contend the trial court erred in awarding interest on the entire amount due under the master lease retroactively from February 1, 2000, because the master lease did not contain an acceleration clause. *See* Record, No. 187, Exhibit List, No. 1 at 1. Rent, ¶ (a), at p. 1. ("Interest at the per annum rate of twelve percent (12%) will be charged retroactive to the first day of the month for rents not paid by the tenth (10th) of the calendar month."). Appellants further contend Trizechahn's failure to terminate the lease in

the wake of the default also mandates that interest should only accrue on rental payments as they became due in accordance with the provisions in the master lease.

¶ 67 After careful review of the relevant master lease provisions, we agree with appellants' assessment. The master lease, which remained in effect until the end of the proscribed term, is lacking an acceleration clause that would allow it to call the balance due under the lease the moment appellants defaulted. The lease itself speaks of interest only accruing on a rental payment in arrears after the payment becomes due. Record, No. 187, Exhibit List, No. 1 at ¶ 1(a). Finally, Trizechahn submitted an interest projection to the trial court wherein it calculated the interest it thought it was entitled to in accordance with the plain language of paragraph 1(a). Record, No. 187, Exhibit List, Exb. 11, Interest Calculations.

¶ 68 The trial court erred as a matter of law in subverting both the plain language of the master lease and the import of the parties' subsequent actions. *Croker, supra* at 1215. There was simply no rational foundation—either in law or in fact—for the trial court's interest award. *Rissi, supra* at 136. Indeed, although Trizechahn only requested $471,002.20 in interest on the rental payments in arrears, the trial court awarded it in excess of $1,000,000. Trial Court Opinion at 20. On remand, the trial court is charged with recalculating the interest due in accordance with the terms of the master lease and this Opinion.

■■■■ ¶ 69 e. *Counsel Fees.* The general rule in this Commonwealth is that there is no recovery of attorneys' fees from an adverse party in the absence of an express statutory authorization, clear agreement between the parties, or the application of a clear exception. *Neal v. Bavarian Motors, Inc.,* 882 A.2d 1022,

1032 n. 11 (Pa.Super.2005), *allocatur denied* 589 Pa. 722, 907 A.2d 1103 (2006). In concluding appellants were liable for Trizechahn's legal fees, the trial court relied solely on paragraph 15(g) of the master lease which provides:

15.  LANDLORD'S REMEDIES

. . .

(g) The tenant agrees that if it shall at any time fail to make any payment or perform any other act on its part to be made or performed under this lease, the Landlord may, but shall not be obligated to, and after reasonable notice or demand and without waiving, or releasing the Tenant from, any obligation under this lease, make such payment or perform such other act to the extent the Landlord may deem desirable, and in connection therewith to pay expenses and employ counsel. The Tenant agrees to pay a reasonable attorney's fee if legal action is required to enforce performance by Tenant of any condition, obligation or requirement hereunder. All sums so paid by the Landlord· and all expenses in connection therewith, together with interest thereon at the rate of 10% per annum from the date of payment, shall be deemed additional rent hereunder and payable at the time of any installment of Rent thereafter becoming due and the Landlord shall have the same rights and remedies for the non-payment thereof, or of any other additional rent, as in the case of default in the payment of Rent.

Record, No. 187, Exhibit List, No. 1, p. 10.

¶ 70 Appellants contend the word "hereunder" refers only to obligations that are outlined within paragraph 15(g) itself, not the master lease as a whole, and, as such, attorneys' fees should not have been awarded because the pursuit of rent in

arrears was not one of the obligations outlined. Appellants further contend that, at best, the provision is ambiguous, which requires this Court to construe the provision against Trizechahn as the drafter.

¶ 71 Paragraph 15(g), in our estimation, is ambiguous as it is "reasonably susceptible to different constructions and capable of being understood in more than one sense." *J.W.S. Delavau v. E. Am. Transp. & Warehousing*, 810 A.2d 672, 681–682 (Pa.Super.2002), *quoting Madison Construction Co. v. Harleysville Mutual Ins. Co.*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999). On one hand, the clause could be read as allowing for the award of attorneys' fees in situations where Trizechahn is pursuing legal action to collect rental payments in arrears. Alternatively, the provision could be read as allowing the recovery of attorneys' fees only in situations where Trizechahn forwards payments on behalf of appellants for operating costs and taxes for which appellants were liable under the master lease terms. *See* Record, No. 187, Exhibit List, No. 1 at ¶ (1)(b). Indeed, with the exception of the words "or any other act on its part," an objective reading of the provision overwhelmingly favors appellants' interpretation.

¶ 72 Our jurisprudence requires a *clear* agreement for counsel fees, which we do not have in this case. *Neal, supra* at 1032 n. 11. Accordingly, we vacate the award of counsel fees as it constitutes an error of law. *Rissi*, supra at 136.[14]

## E. O'Connor and Stadler

¶ 73 O'Connor and Stadler ("appellants" in this section of this Opinion) in raising the issue of whether they should be held liable as individuals on the damage award, forward four arguments.

■ ¶ 74 First, appellants contend it is fundamentally unfair for individual liability to attach to them. Appellants point out that while they were partners in T & M at the time the master lease was executed, they left the firm years before the lease was breached. They also point out that they were not notified of the default until litigation began and that they were not party to any discussions pertaining to resolution of the dispute. They further direct this Court to the trial court's decision to dismiss former defendant C. Richter Taylor as evidence that the trial court was acting impartially towards them due to the fact that Taylor was also a partner in T & M at the time the master lease was executed. *See generally,* 15 Pa.C.S.A. § 8327(2).

¶ 75 Appellants' first argument is nothing more than a plea to absolve them of liability based on vague notions of "unfairness." There is no citation to any legal authority contained within the argument that would give this Court a basis on which to override liability imposed by operation of statute. Furthermore, with respect to former defendant Taylor, the trial court noted, "credible evidence shows [he] was effectively out of the Partnership before the lease date of October 25, 1995, but . . .

---

**14.** By way of further analysis, the provision in paragraph 15(g) was not one of the bargained for alterations to the master lease. As such, it would be a mistake to ascribe any intent to Trizechahn in drafting the attorneys' fees clause. Thus, there is no reason to remand for an evidentiary hearing for purposes of introducing parol evidence from Trizechahn as the only conceivably credible parol evidence that could be offered would be the intent of appellants, which was clearly to *not* be held liable for attorneys' fees.

Inasmuch as this is the case and inasmuch as we are unable to construe the ambiguous attorneys' fees clause against Trizechahn because it is not the actual drafter of this clause, the clause should still be read in accordance with appellants' argument because the only conceivable evidence that could be offered bolsters this reading.

technically did not leave until after that date." Trial Court Opinion at 21. While we are uncertain as to the actual meaning of this phrase, Taylor's dismissal is not challenged by Trizechahn, nor any other party, and as such we must operate under the assumption that the trial court correctly dismissed Taylor due to the fact that he was not a partner when the master lease was executed. In short, appellants' first argument affords them no relief.

¶ 76 Appellants' second argument is premised on the following statutory provision:

> (b) AGREEMENT.—A partner is discharged from any existing liability upon dissolution of the partnership by an agreement to that effect between himself, the partnership creditor and the person or partnership continuing the business. The agreement may be inferred from the course of dealing between the creditor having knowledge of the dissolution and the person or partnership continuing the business.

15 Pa.C.S.A. § 8358, **Effect of Dissolution on existing liability of partner,** (b) **Agreement.**

¶ 77 Appellants argue Trizechahn was made aware of the partnership dissolution agreement pertaining to the liquidation of T & M and were also conscious of the fact appellants were not a party to this agreement and that this awareness gives rise to the inference that Trizechahn released appellants from their individual liability under the lease.

¶ 78 Appellants' third argument is also premised on a provision of the Uniform Partnership Act, which provides:

> (c) ASSUMPTION OF OBLIGATION.—Where a person agrees to assume the existing obligations of a dissolved partnership, the partners whose obligations have been assumed shall be discharged from any liability to any

creditor of the partnership who, knowing of the agreement, consents to a material alteration in the nature or time of payment of the obligations.

15 Pa.C.S.A. § 8358, (c) **Assumption of Obligation.**

¶ 79 Appellants maintain Trizechahn's knowledge of the dissolution plan and their absence from it constitutes consent to the "material alteration in the nature or time of payment of the obligations" such that appellants were no longer liable under the master lease. *Id.*

■■■■ ¶ 80 Appellants' second and third arguments were not raised in the trial court. A thorough review of appellants' answers, proposed findings of fact, post-hearing brief, motion for post-trial relief, and the hearing transcripts reveals that there was never any mention of the applicability of section 8358 to this dispute. *See* Record, Nos. 27, Answer and New Matter to Second Amended Complaint; 113, Defendants' Proposed Findings of Fact; 114, Post–Hearing Brief on Behalf of Defendants; 135, Motion for Post–Trial Relief Pursuant to Pa.R.Civ.P. 227.1, [**Post–Trial Relief**] ("Mr. O'Connor and Mr. Stadler were not partners when the Defendants ceased paying rent or at the time of any alleged default. The evidence was clear that the Plaintiff never underwrote the Lease based on their individual financial statements and knew of their departures. Because Mr. O'Connor and Mr. Stadler withdrew from the partnership when it was current on its Lease obligations and the Plaintiff knew of their departures, they cannot be liable for any damages for any alleged breach of the Lease following their departure. *See generally In re Labrum & Doak,* 237 B.R. 275 (Bankr.E.D.Pa.1999).... Issues as to the liability of Messrs. Stadler and O'Connor were raised by Answer prior to trial, dur-

ing argument at trial and in the Defendants' Proposed Findings of Fact and Conclusions of Law."). Appellants' failure to raise these arguments constitutes waiver.[15] *Milicic v. Basketball Mktg. Co.*, 857 A.2d 689, 693 (Pa.Super.2004), *citing* Pa.R.A.P. 302, **Requisites for Reviewable Issue**, (a) **General rule** (additional citation omitted).

¶ 81 Appellants' fourth and final argument simply paraphrases their first three arguments without any citations to the record or governing precedent. Accordingly, it warrants no further consideration. The trial court's finding of individual liability as to O'Connor and Stadler is affirmed.

**Cross–Appeal at 1151 WDA 2006**

¶ 82 Trizechahn's raises the following issue for our review:

VIII. Whether the Trial Court properly granted summary judgment in favor of Donald T. Dulac, Jr.; Charles B. Watkins; Suzanne L. DeWalt; Henry R. Johnston, III; Debra M. Parrish; Stephen R. Kaufman and Thomas M. Hardiman?

Trizechahn's brief at 5.

¶ 83 Our standard of review over a trial court's decision to grant summary judgment requires us to determine whether the record presents a question of material fact concerning an element of the claim or defense at issue. *Creazzo v. Medtronic, Inc.*, 903 A.2d 24, 28 (Pa.Super.2006), *quoting Pappas v. UNUM Life Ins. Co.*, 856 A.2d 183, 186 (Pa.Super.2004). Our scope of review over a grant of summary judgment is plenary. A defendant may establish a right to summary judgment by demonstrating that the plaintiff is incapable of producing the facts necessary to prove an essential element of his or her claim. If the plaintiff is unable to defeat the defendant's motion by producing evidence that raises a factual dispute as to the specific element at issue, the defendant is entitled to summary judgment as a matter of law. *Id.*

¶ 84 The trial court, in granting summary judgment to cross-appellees, relied on the following provision:

A person admitted as a partner into an existing partnership is liable for all the obligations of the partnership arising before his admission as though he had been a partner when the obligations were incurred except that this liability shall be satisfied only out of partnership property.

15 Pa.C.S.A. § 8329, **Liability of incoming partner.**

¶ 85 The trial court concluded that all cross-appellees had joined T & M after the master lease had been executed and, therefore, could not be held liable as a matter of law. *See also Weisenberg v. Mount Royal Assocs.*, 446 Pa.Super. 384, 666 A.2d 1103, 1108 (1995).

¶ 86 Trizechahn attacks this conclusion by raising a number of arguments. First,

---

**15.** Given the complexity of the litigation, the sophistication of the parties involved, and the duration of the proceedings below, we find that strict application of the waiver doctrine is appropriate in this case. Even if we were to conclude that appellants' arguments were ripe for consideration, we would not be able to accept appellants' argument that Trizechahn's mere knowledge of the dissolution plan can supply the factual predicate necessary to infer an agreement whereby Trizechahn released appellants from liability. The connection is simply too tenuous and the danger of inferring agreements based on such tenuous connections is significant.

We would also not be able to accept appellants' argument that Trizechahn "consent[ed] to a material alteration in the nature or time of payment of the obligations." 15 Pa.C.S.A. § 8358(c). The record actually discloses the opposite is true—despite Trizechahn's awareness that T & M was planning to liquidate, Trizechahn doggedly pursued the rent it was owed under the master lease.

Trizechahn contends that while cross-appellees were not yet T & M partners when the master lease was executed, they were partners by the time the storage lease was executed and, therefore, summary judgment should not have been granted because cross-appellees still potentially could be liable under the storage lease as individuals.

¶ 87 The trial court found, "The Second Storage Lease was terminated effective April 30, 2002, by agreement of the parties and is not part of the instant dispute." Trial Court Opinion at 3. The evidence of record establishes Trizechahn terminated the lease by right effective April 30, 2000. Record, No. 187, Exhibit List, No. 42; *see also id.* at No. 2, ¶ 13. Yet, the trial court also found appellants and cross-appellees owed a total of $1,602.24 on the storage lease and then awarded this amount to Trizechahn—even though it concluded cross-appellees could not be held individually liable under the storage lease. Trial Court Opinion at 4, ¶¶ 11, 20.

■ ¶ 88 Whatever the case may be, we conclude Trizechahn waived this argument. Trizechahn first pled a count for breach of the storage lease in its initiating complaint. Record, No. 1, at Count III. Cross-appellees Dulac and Watkins, the first cross-appellees to file a motion for summary judgment, specifically denied individual liability under the storage lease in their motion:

29. Defendants Dulac and Watkins were associated with T & M at the time the Storage Lease was entered into, but they both terminated their associations with T & M several months before T & M's alleged failures to pay rent under the Storage Lease occurred.

Record, No. 56, at Count III.

¶ 89 Although Trizechahn clearly was aware of this denial, it failed to address it in either its brief in opposition to the motion for summary judgment or its supplemental response to the motion even though doing so would have been in its best interests. Record, Nos. 65, 66.

¶ 90 Cross-appellee Johnson later filed a motion to join the adjudication on the Dulac and Watkins motion in which it averred: "The position of Johnson is identical to the position of Watkins, and Johnson would have so asserted had he joined in the aforesaid Motion for Summary Judgment." Record, No. 68, Motion to Join Defendant Henry R. Johnson III in Prior Summary Judgment Adjudication, ¶ 2. Once again, Trizechahn did not raise the issue of individual liability under the storage lease.[16]

¶ 91 Finally, Trizechahn failed to raise the issue in defending against the motion for summary judgment filed by cross-appellees Hardiman, Parrish, and Kaufman. Record, No. 88, Response to Motion for Summary Judgment of Defendants Thomas M. Hardiman, Debra M. Parrish, and Stephen R. Kaufman.[17]

---

16. While cross-appellee DeWalt also may have filed a motion to join, it does not appear within the certified record or on the docket sheet and, therefore, does not enter into our analysis.

17. Trizechahn contends: "The Storage Lease was not even placed at issue in the Motion for Summary Judgment of the Parrish Defendants.... A respondent to a summary judgment motion should not be required to roam the legal pastures searching for every imagin-

able affirmative defense to a summary judgment motion." Cross–Appellant's reply brief at 8.

Trizechahn is correct in its contention that the cross-appellees Hardiman, Parrish, and Kaufmann did not put the storage lease at issue in their motion for summary judgment. *See* Record, No. 87. This contention, however, is of no moment. As is discussed above, Trizechahn was clearly aware, by the time this motion was filed, that the other cross-

¶ 92 In summation, Trizechahn waived its right to argue that cross-appellees should be held personally liable under the storage lease by failing to raise this argument in the trial court at the appropriate time, specifically when the various dismissed defendants sought absolution from personal liability under the storage lease. *See Milicic, supra* at 693.[18]

¶ 93 Trizechahn next contends the trial court erred by concluding cross-appellees were not liable under section 8329. Trizechahn maintains section 8329 only relieves cross-appellees from having to satisfy the judgment out of their personal resources, it does not absolve them from *liability* in the first instance. In *Weisenberg, supra* this Court held as follows:

> [Section 8329] was clearly designed to limit satisfaction of liability for any new partners who come into a partnership after the partnership has incurred an obligation. While these individuals remain liable for partnership obligations which arose before that person's admission to the partnership, their liability can only be satisfied out of partnership property.... In sum, we find the plain reading and purpose behind § 8329 to be clear and we conclude that Appellant ... cannot be held personally liable for payment of the obligation created by the partnership.

*Id.* at 1108.

¶ 94 The salient question not answered by *Weisenberg* is whether a newly admitted partner, who is not individually liable for a previously incurred partnership debt, nevertheless may have judgment entered against him or her. Trizechahn contends that without such a judgment in this case, it cannot execute on the various cross-appellees' interest in the partnership. Cross-appellees argue, conversely, that a judgment of individual liability is superfluous given the circumstances because Trizechahn already is entitled to execute against T & M's assets up to the amount of the judgment owed.

¶ 95 We admit that section 8329 does not represent a model of drafting clarity and could be read as being internally inconsistent on its face. To compound matters further, while the *Weisenberg* Court held that with respect to incoming partners, "these individuals remain liable for partnership obligations which arose before that person's admission to the partnership" the Court went on to apply this rule and concluded the appellant in that case "cannot be held personally liable" for an obligation incurred prior to the appellant's admission into the partnership. *Id.* at 1108.

¶ 96 Given these problems, we must construe section 8329 in a manner the legislature would endorse. *See generally,* 1 Pa. C.S.A. § 1922(1), **Presumptions in ascertaining legislative intent** ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: (1) That the General Assembly does not intend a result that is absurd, impossible

---

appellees were granted summary judgment on the issue of individual liability under both the master and storage leases. *See* Record, Nos. 67, 68 (Orders granting summary judgment in favor of cross-appellees Dulac, Watkins, and Johnson). Given this undisputed notice, it was Trizechahn's burden to raise the issue of the Parrish cross-appellees individual liability under the storage lease—these cross-appellees did not have a duty to hang themselves.

18. Even if we were to determine that Trizechahn did not waive this issue, we are unaware of when cross-appellees entered the partnership; we therefore have no way of knowing whether they entered prior to the execution of the storage lease. Trizechahn fails to point to any evidence of record demonstrating when each cross-appellee joined T & M.

of execution, or unreasonable."). After a searching analysis, we are compelled to agree with cross-appellees' position.

¶ 97 Obviously, any attempt to ascertain legislative intent is complicated by the fact that section 8329 is adopted from a Model Code. *See* Uniform Partnership Act § 17 (1914). We must, therefore, proceed under the assumption that the General Assembly, in adopting various provisions of the Uniform Partnership Act wholesale, concurred with the reasoning set forth in both the Act and the comments thereto. The comments to UPA § 17 provide:

The present section eliminates the difficulty which arises when a new partner is admitted without liquidation of firm debts. The present theory of the common law is that a new partnership is formed; all the property of the partnership which existed up to the moment of the entrance of the new partner being transferred to the new partnership. The result of this theory is that if the business fails, the creditors who have extended credit after the admission of the new partner have a prior claim on the assets in the business. The inequitable character of this result has led the courts, where no notice of the change of membership is had by the creditors, to be diligent in finding an assumption of liability on the part of the new partnership of the debts of the old partnership.

Though this section changes the formal statement of the law, which is to the effect that an incoming partner is not liable for debts contracted before his admission, as a matter of fact the section as worded conforms to the actual decisions of the courts, which however, are arrived at by making every effort to impress an assumption of liability on the part of the new partnership, formed as a result of the admission of the new partner, of the debts of the old partnership.

The difficulty, which is overcome by this section as worded, is illustrated by the common case where all the property of the existing partnership is taken over, without notice of any break in the conduct of business, by the new partnership composed of all the members of the existing partnership and the incoming partner; thereby depriving the existing partnership of all its property. Both the existing and the subsequent creditors may believe it is one and the same partnership, but, as stated, such would not be the case under the present law. There is no peculiar equity in the subsequent creditors giving them a right to be preferred, as against the property employed in the business, to the existing creditors. The incoming partner partakes of the benefit of the partnership property and an established business. He has every means of obtaining full knowledge and protecting himself, because he may insist on the liquidation or settlement of existing partnership debts. The creditors have no means of protecting themselves. So as to preserve the present law as nearly as possible it is declared that the liability of the incoming partner shall be satisfied only out of partnership property. *It, therefore, results that existing and subsequent creditors have equal rights as against partnership property and the separate property of all the previously existing members of the partnership, while only the subsequent creditors have rights against the **separate estate** of the newly admitted partner.*

Uniform Partnership Act § 17, comments (emphasis added).

¶ 98 The critical distinction that must be maintained lies in the difference between liability *as a partner* versus liability *as an individual.* Without this distinction, section 8329 reaches an absurd result. The

Pennsylvania Rules of Civil Procedure, which govern the entrance and execution of judgments, defines a "judgment" as a "judgment, order or decree requiring the payment of money entered in any court which is subject to these rules, including a final or interlocutory order for payment of costs...." Pa.R.C.P. 3020, **Definition.** Pursuant to this definition, entering a judgment against cross-appellees as individuals would be superfluous due to the fact that incoming partners cannot be required to pay money out of his or her individual estate. Thus, by definition, a finding of individual liability under these circumstances would be nothing other than a wasteful formality that would not result in any practical consequence. We have difficulty envisioning that the drafters of the UPC, or our General Assembly for that matter, intended section 8329 to operate in such a manner—and nothing in the comments to UPC § 17 convinces us otherwise.

¶ 99 Furthermore, we find Trizechahn's contention that in the absence of a judgment against each cross-appellee as an individual, it will be unable to execute on each cross-appellee's share of the partnership property to be unfounded. This Commonwealth's version of the UPA provides as follows:

(3) The right of a partner in specific partnership property is not subject to attachment or execution *except on a claim against the partnership. When partnership property is attached for a partnership debt, the partners, or any of them, or the representatives of a deceased partner, cannot claim any right under the homestead or exemption laws.* 15 Pa.C.S.A. § 8342, **Nature of right of partner in specific partnership property (b)(3) Incidents of Tenancy** (emphasis added).

¶ 100 This provision makes it clear that once judgment is entered against the partnership, an individual's right to any property held by the partnership may also be attached—irrespective of whether the partner can be held liable as an individual under the judgment. Consequently, allowing judgment to be entered against an incoming partner as an individual would be pointless, absurd, and a waste of judicial resources.[19] *See generally,* 1 Pa.C.S.A. § 1922(1), *supra.* The only conceivable function that would be served by allowing such judgments to be entered—namely, protecting a creditor by allowing them the ability to pursue all of the assets of a partnership irrespective of each individual partner's share therein—is carried out by operation of Section 8342.[20]

19. Trizechahn contends, "there are many, many instances where a judgment cannot be executed upon because of one or more exemptions and immunities provided by law." Cross-appellant's reply brief at 2, *citing* Pa. R.C.P. 3123.1, **Claim for Exemption or Immunity of Property. Prompt Hearing.** Trizechahn's contention misses its mark. Rule 3123.1 acts as a bar to the execution of a judgment on certain categories of property held by a debtor, not to the execution of a judgment on the actual debtor.

20. We recognize that a situation could arise where an incoming partner, not held individually liable by operation of section 8329, could attempt to remove the personal property in which he or she has an interest from a partnership that has been held liable. Such a situation cannot arise in this case because the assets of T & M are currently held by a trustee in a bankruptcy estate.

If such a situation were to arise in another case, however, we are confident that a cause of action sounding in fraud or conversion would be adequate to deal with such a removal of partnership assets.

We also recognize that situations may arise where a judgment is entered against a partnership that can be satisfied by executing on only a portion of the partnerships' assets. We do not think our interpretation of section 8329 presents difficulties in such an instance

■ ¶ 101 Trizechahn's final argument is that cross-appellees Hardiman, Parrish, and Kaufmann are individually liable by virtue of a provision in the T & M dissolution plan, which allegedly evinces Hardiman's, Parrish's, and Kaufmann's collective intention to assume individual liability for payment of the sums due under both the master and storage leases. In support of this argument, Trizechahn points to the following provision of the plan:

8. The order of application of the liquid assets of the Firm from the Receipts of fees and expenses or from other sources shall be as follows:

f. Payment of all outstanding accounts payable or other unsecured debts of the Firm, including but not limited to rent or any amount determined by the Administrator as necessary to reasonably assure termination of the Firm's lease on its premises.

Trizechahn's brief at 92; *see also* Record, No. 56, Motion for Summary Judgment of Defendants Donald T. Dulac, Jr., and Charles B. Watkins, Exb. H, Plan of Liquidation.

■ ¶ 102 We easily dispose of Trizechahn's final argument. A party becomes a third-party beneficiary when recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either: a) "the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary;" or 2) "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *See Chen v. Chen*, 586 Pa. 297, 893 A.2d 87, 89 n. 3 (2006), *citing* **Restatement (Second) of Contracts**

§ 302(1)(b) **Intended and Incidental Beneficiaries** (additional citation omitted).

¶ 103 Here, none of the foregoing conditions has been satisfied. The dissolution plan was aimed at memorializing the intentions of the various members of T & M in liquidating the firm. It is difficult to see how the intent to liquidate would be effectuated by holding cross-appellees Hardiman, Parrish, and Kaufmann individually liable under the master lease. Moreover, there are no extenuating circumstances indicating Hardiman, Parrish, and/or Kaufmann intended to give Trizechahn the benefit of any promised performance because, in the provision of the dissolution agreement relied upon by Trizechahn, there is no performance promised by Hardiman, Parrish, and/or Kaufmann to any party, let alone Trizechahn itself. Rather, the explicit meaning of the provision is to instruct the liquidation estate administrator of the order in which the estate's assets were to be disposed. Thus, the grant of summary judgment to cross-appellees Dulac, Watkins, Johnston, DeWalt, Hardiman, Parrish, and Kaufmann is affirmed.

## IV. Conclusion

¶ 104 The trial court's imposition of individual liability against appellants Arbogast and Wettach is reversed. Judgment is vacated as it relates to counsel fees in the amount of $326,623.58. Judgment is also vacated as to any and all interest awarded and this case is remanded for the limited purpose of recalculation of interest. In all other respects, judgment is affirmed. The Orders granting summary judgment to cross-appellees Dulac, Watkins, Johnston, DeWalt, Hardiman, Parrish, and Kaufmann are affirmed.

---

as the assets of the partnership allocated to the judgment would still be carried out in accordance with the percentage stake each partner owns in the partnership. 15 Pa.

C.S.A. § 8329 ("A person admitted as a partner into an existing partnership is liable for all the obligations of the partnership....").

¶ 105 Judgment affirmed in part, reversed in part, vacated in part, and case remanded for proceedings consistent with this Opinion.

¶ 106 Jurisdiction relinquished.

¶ 107 Concurring and Dissenting Statement by ORIE MELVIN, J.

## CONCURRING AND DISSENTING STATEMENT BY ORIE MELVIN, J.:

¶ 1 I concur in the majority's decision in 1050 WDA 2006 and 1091 WDA 2006 to vacate the award of counsel fees and interest, remand for the limited purpose of recalculating interest, and affirm the judgment in all other respects. I also concur in the majority's decision to affirm the orders challenged on cross-appeal in 1151 WDA 2006.

¶ 2 I dissent, however, from the majority's decision in 1050 WDA 2006 and 1091 WDA 2006 to reverse the imposition of individual liability against Appellants Thomas D. Arbogast and Thomas C. Wettach. While I agree with the majority that Arbogast and Wettach are the only two Appellants conceivably protected against liability under Section 28(i) of the master lease (referred to by the majority as the "absolution clause"), Maj. Op. at 538, I disagree that the latter portion of that same section is ambiguous as to whether they are also protected against liability in their individual capacities. Section 28(i), which I believe should be read as a whole and not carved into separate clauses, clearly means that "such representatives would not be subject to liability merely for having signed" and does not "purport to excuse anyone who might be personally liable on the [master] lease for other reasons." Trial Court Opinion, 3/31/05, at 21–22. Here, the individual liability of Arbogast and Wettach arises not from the fact that they executed the master lease on behalf of the partnership but from their separate juridical existence as general partners. These Appellants, in other words, donned their "representative hat" but did not remove their "partner hat" when they executed the master lease on behalf of the partnership. Accordingly, I would affirm the judgment imposing individual liability on Appellants Arbogast and Wettach.