J-A11006-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| YORK DEVELOPMENT LIMITED PARTNERSHIP, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ATLANTIC WIRELESS GROUP, INC. T/D/B/A CINGULAR WIRELESS AND THE WIRELESS EXPERIENCE OF PA, | |
| Appellant | No. 1519 MDA 2016 |

Appeal from the Judgment Entered August 31, 2016
In the Court of Common Pleas of York County
Civil Division at No(s): 2012-SU-004408-89

| | |
|---|---|
| YORK DEVELOPMENT LIMITED PARTNERSHIP, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| ATLANTIC WIRELESS GROUP, INC. T/D/B/A CINGULAR WIRELESS AND THE WIRELESS EXPERIENCE OF PA, | |
| Appellee | No. 1524 MDA 2016 |

Appeal from the Judgment Entered August 31, 2016
In the Court of Common Pleas of York County
Civil Division at No(s): 2012-SU-004408-89

BEFORE: SHOGAN and MOULTON, JJ., and STEVENS, P.J.E.[*]

---

[*] Former Justice specially assigned to the Superior Court.

J-A11006-17

MEMORANDUM BY SHOGAN, J.:                    **FILED OCTOBER 02, 2017**

Atlantic Wireless Group, Inc. t/d/b/a Cingular Wireless ("Atlantic") and The Wireless Experience of PA[1] filed an appeal at Docket Number 1519 MDA 2016, from the judgment entered on August 31, 2016, in the amount of $110,719.99, against them and in favor of York Development Limited Partnership ("York") following a bench trial. York filed a cross-appeal at Docket Number 1524 MDA 2016. By order filed October 4, 2016, this Court *sua sponte* consolidated these appeals. After review, we affirm in part and reverse in part. We remand for a recalculation of damages.

These actions and consequent appeals result from the breach of a commercial lease entered into by the parties on August 12, 2004 ("Lease"). On October 26, 2012, York filed a complaint against Atlantic. On May 8, 2014, with leave of court, York filed an amended complaint against Atlantic, asserting one count of breach of contract and seeking judgment in its favor for the unpaid rent through the end of lease term in the amount of $165,854.25. Atlantic filed an answer and a counterclaim. In its counterclaim, Atlantic asserted one count of breach of contract and raised multiple affirmative defenses.

_____

[1] Because these entities acted as one throughout the proceedings, and because Atlantic was the party to the Lease at issue, Atlantic will be used to refer to Atlantic and The Wireless Experience of PA, collectively, throughout this Memorandum.

J-A11006-17

A nonjury trial was held on April 13, 2016. Following trial, the trial court announced from the bench that it found in favor of York and against Atlantic in the amount of $110,719.99, together with interest at the statutory rate from the date of entry of judgment. N.T., 4/13/16, at 146. Generally, the trial court found that Atlantic breached the lease, but also that York failed to fully attempt to mitigate the loss, as required by the Lease. It also found no basis for awarding York attorneys' fees. The court found against Atlantic on its counterclaim.

The trial court made the following findings after the nonjury trial:

[T]he Court finds that [York] is a limited partnership that owns the leased premises in Northwest Plaza. [Atlantic] who [sic] were the tenants under [the Lease] dated August 12, 2004.[2]

The parties entered into [the Lease] on that date for property at 1139 B Northwest Plaza Shopping Center in York County, Pennsylvania [("Northwest Plaza Property")]. The term of the lease was for a period of 10 years to run through the end of August 2014 unless terminated earlier. [Atlantic] paid the rent through July 31, 201[2]. On September 4, 2012, the Plaintiff sent a letter to [Atlantic] regarding notice of default abandonment, failure to pay rent, and competition.

. . . . Minimum rent was $61,250 per year, payable monthly in advance by the first of each month. It provided for a three

---

[2] The Lease was entered into by Atlantic. N.T., 4/13/16, at 32. In late 2009 or early 2010, Wainwright created The Wireless Experience of PA which took over some business operations of Atlantic. Atlantic and The Wireless Experience of PA operated a business of wireless communications sales and service. *Id.* at 26-33. Atlantic operated and occupied the Northwest Plaza Property store through July 2012. *Id.* at 33.

- 3 -

percent increase in the rent each year and provided for a five percent penalty in the event of late payment of rent.

There was a security deposit requirement. It's unclear whether or not that payment of security deposit was $5,104 or $10,208. However, to the extent that the security deposit has not been applied to unpaid rent, [York] may apply that to the judgment and [Atlantic] will be given credit for that amount.

The lease required that the tenant use the lease premises solely for the purposes of conducting the business of wireless communication sales and services and related products and service. [Atlantic] was precluded from using or permitting the property to be used for any other business or purpose.

The tenant was required to remain open for business during customary business days and hours for the vicinity but no less than 10:00 a.m. to 6:00 p.m. Monday through Saturday. The tenant was to keep the display windows and signs lighted[,] and was to identify Northwest Plaza in any advertising. There was no assignment permitted without prior written consent of the landlord.[3]

The lease provided that the landlord had certain remedies if the tenant defaulted. That would be within 30 days after written notice of the default to either evict the tenant, to enter on to the premises, or to release the premises. And if the landlord reentered the premises, the lease was to terminate. The tenant remained obligated to pay the rent and other charges, but the tenant, though, [was] specifically entitled to credit for rent received for the landlord re-renting the premises.

We find that [Atlantic] breached the lease by failing to use the premises for the purposes as required by the lease, failed to remain open for business, failed to pay rent, moving the business to a location within three miles of the lease premises, advertising the new location on the premises of the leased

_____

[3] Pursuant to the Lease, Atlantic also was prohibited from opening or operating another store that had a similar or competing business, within a three-mile radius of the property.

premises at Northwest Plaza. The tenant vacated the property without any prior notice of the landlord.

We find no eviction by the landlord. The action taken by the landlord given that there was no prior notice or communication from the tenant was certainly reasonable. The tenant did not contact the landlord after August 2012 about the tenant's intention with regard to the premises, nor with any of the tenant's plans for the premises after August of 2012.

We also note that the tenant did not contact the landlord prior to moving from the leased premises. Just as an aside, this entire litigation could most likely have been avoided entirely had the tenant taken the time to contact the landlord.

The tenant ceased doing business at the leased premises at Northwest Plaza on July 31, 2012. It opened for business at the new location at 303 Arsenal Road on August 1, 2012. The tenant moved the inventory to the new store location and a few days later removed the fixtures and equipment.

The landlord gave notice of default to the tenant on September 4, 2012. Mr. [Robert] Reynolds [("Reynolds"), Manager of York], had testified that [York] did attempt to re-lease the premises in 2012 after the tenant left, but was unable to find a new tenant.

Trial Court Opinion, 4/18/16, at 1-5.

Both parties filed post-trial motions, which were denied. Judgment was entered in favor of York in the amount of $110,719.99, on August 31, 2016. Atlantic filed a notice of appeal on September 12, 2016. York filed its notice of appeal on September 16, 2016. Both parties were directed to and filed statements pursuant to Pa.R.A.P. 1925(b). The trial court filed a Pa.R.A.P. 1925(a) opinion, and in it, refers this Court to the trial court's order and general findings filed April 18, 2016. Trial Court Opinion, 11/14/16, at 1-2.

Atlantic presents the following issues for our review:

I.      Did Atlantic Wireless, the tenants/Appellee, abandon the Property, where they were locked out by York Development, the landlord/Appellant, had left valuable fixtures in the Property and planned to sue them for a cell phone repair business in the Property if the landlord would not renegotiate the lease?

II.      Did York Development evict Atlantic Wireless from the Property, where the landlord twice locked tenants out of the Property without notice and with the intent to deny them access?

III.     Was York Development entitled to damages even though it failed to comply with its duties under the Lease to provide Atlantic Wireless with notice and opportunity to cure any alleged breach?

        A.      Was there any basis for awarding attorneys' fees to York Development?

        B.      Was York Development entitled to liquidated damages?

        C.      Was York Development entitled to prejudgment interest?

IV.     Did the trial court err in its calculation of damages awarded to York Development?

V.      Did York Development have an obligation to mitigate damages?

Atlantic's Brief at 1-4.[4]

---

[4] We note that Atlantic's Issues III.(A), (B), and (C), and V. were not raised in its Pa.R.A.P. 1925(b) statement. "Any issues not raised in a 1925(b) statement will be deemed waived." *Commonwealth v. Hill*, 16 A.3d 484, 491 (Pa. 2011) (quoting *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998). Because these issues were raised by York on appeal and preserved in its Pa.R.A.P. 1925(b) statement, however, these issues will nonetheless be discussed in the context of York's cross-appeal.

Our standard of review is as follows:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as the verdict of a jury, and the findings will not be disturbed on appeal unless predicated upon errors of law or unsupported by competent evidence in the record. Furthermore, our standard of review demands that we consider the evidence in a light most favorable to the verdict winner.

**Baney v. Eoute**, 784 A.2d 132, 135 (Pa. Super. 2001) (citations omitted).

This appeal concerns the interpretation and application of a contract.

> In Pennsylvania, lease agreements are governed by contract law and general contract law principles. As such, when the language of a lease is clear and unequivocal, its meaning will be determined by its contents alone in ascertaining the intent of the parties. Every contract imposes a duty of good faith and fair dealing on the parties in the performance and the enforcement of the contract.

**Trizechahn Gateway, LLC v. Titus**, 930 A.2d 524, 533–534 (Pa.Super.2007) (citations omitted). Inasmuch as a lease must be construed according to general principles of contract law, we are mindful that the primary objective in construing a contract is to effectuate the intentions of the parties. **Id.** at 537 (citing **Seven Springs Farm v. Croker**, 569 Pa. 202, 207, 801 A.2d 1212, 1215 (2002)).

Nonetheless, it is firmly settled that the intent of the parties to a written contract is contained in the writing itself. **Krizovensky v. Krizovensky**, 425 Pa.Super. 204, 624 A.2d 638, 642 (1993), *appeal denied*, 536 Pa. 626, 637 A.2d 287 (1993). Accordingly, when the words of a contract are clear and unambiguous, we are to determine what the parties intended by looking only at the express language of the agreement. **Id.**

> Where there is any doubt or ambiguity as to the meaning of the covenants in a contract or the terms

of a grant, they should receive a reasonable construction, and one that will accord with the intention of the parties; and, in order to ascertain their intention, the court must look at the circumstances under which the grant was made. It is the intention of the parties which is the ultimate guide, and, in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement.

*In re Estate of Quick*, 588 Pa. 485, 491, 905 A.2d 471, 474–475 (2006) (quoting *Hindman v. Farren*, 353 Pa. 33, 35, 44 A.2d 241, 242 (1945)) (emphasis omitted).

*Giant Food Stores, LLC v. THF Silver Spring Development, L.P.*, 959

A.2d 438, 447-448 (Pa. Super. 2008) (internal quotation marks omitted).

To show a breach of contract, a party must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. When performance of a duty under a contract is due, any nonperformance is a breach.

If a breach constitutes a material failure of performance, the non-breaching party is relieved from any obligation to perform; thus, a party who has materially breached a contract may not insist upon performance of the contract by the non-breaching party. Conversely, a party might breach the contract but still substantially perform its obligations under the agreement. In that case, the breach is deemed nonmaterial and the contract remains in effect. The breaching party retains the right to enforce the contract and demand performance; the nonbreaching party has no right to suspend performance.

*McCausland v. Wagner*, 78 A.3d 1093, 1101 (Pa. Super. 2013) (internal

citations and quotation marks omitted).

Atlantic first argues that the trial court erred in finding that it

abandoned the property when it was actually evicted by York. Atlantic's

- 8 -

Brief at 13. Atlantic asserts that it did not abandon the property, as evidenced by its actions in keeping personal property worth up to $100,000.00 at the Northwest Plaza Property and not removing valuable fixtures. *Id.* at 13-14. Atlantic also asserts that it was current on its rent, which was paid through July 31, 2012. *Id.* at 14. Atlantic further posits that York failed to give notice of any default in payment as required by the Lease. *Id.*

In order to prove abandonment, the landlord bears the burden of demonstrating: (1) an intention on the part of the tenant to abandon; and (2) conduct by which the intention is carried into effect. *Ferrick v. Bianchini*, 69 A.3d 642, 656 (Pa. Super. 2013).

> Furthermore, where a tenant abandons property, a non-breaching landlord has no duty to mitigate damages. *Stonehedge Square Ltd. Partnership v. Movie Merchants, Inc.*, 552 Pa. 412, 715 A.2d 1082 (1998); *Trizechahn Gateway, LLC v. Titus*, 930 A.2d 524 (Pa.Super.2007) (rev'd on other grounds 601 Pa. 637, 976 A.2d 474 (2009)); in accord Restatement (Second) of Property, § 12.1, Comment k ("A tenant who abandons leased property is not entitled to insist on action by the landlord to mitigate the damages, absent an agreement otherwise. Abandonment of property is an invitation to vandalism, and the law should not encourage such conduct by putting a duty of mitigation of damages on the landlord.").

*Id.* at 655-656.

District Manager of the York store,[5] Steven Stanion, testified that Brian Wainwright, President of Atlantic, ("Wainwright"), directed him to move all inventory from the Northwest Plaza store to the Arsenal Road store by July 31, 2012, so that the Arsenal Road store could be opened on August 1, 2012.[6]  N.T., 4/13/16, at 12-13.  Although he could not recall exactly when, Stanion stated that Wainwright gave him this directive in July of 2012.  *Id.* at 11-12.  On July 30 and 31, 2012, Stanion and employees from the Northwest Plaza Property packed inventory and equipment necessary to open the Arsenal Road store.  *Id.* at 13.  On July 31, 2012, Stanion and employees set up computers and cleaned at the Arsenal Road location, in preparation for opening that location on August 1, 2012.  *Id.* at 13.  Stanion opened the store at Arsenal Road for business on August 1, 2012.  *Id.* at 14.  The store at Northwest Plaza was not opened for business on August 1, 2012.  *Id.* at 14.  Stanion returned to the Northwest Plaza store on Sunday, August 5, 2012, to remove some fixtures and equipment that had been left behind at that location.  *Id.* at 14-15.  Stanion did not return to the

_____

[5] The "York store" refers to Atlantic's store operated in York County, and the subject of this action.  It was first located at the Northwest Plaza Property, but later moved to the Arsenal Road location.

[6] Stanion was the District Manager for the York store when it was at the Northwest Plaza location and remained the manager of that store when it was relocated to the Arsenal Road property until August 2014.  N.T., 4/13/2016, at 6-7, 18.  At the time of trial, Stanion continued to serve as a District Manager for Atlantic, but for different stores.  *Id.*

Northwest Plaza location until months later in order to survey damages of the property with representatives of the landlord. *Id.* at 16. Stanion also testified that the Arsenal Road property was located close to the Northwest Plaza Property, opining that it was not more than two miles away. *Id.* at 14.

Matthew Sweigart, Store Manager at the York store during July and August of 2012, testified that he received directions from Stanion to pack the inventory from the Northwest Plaza location and move it to the Arsenal Road location. N.T., 4/13/16, at 18-20. Sweigart testified that he received this information from Stanion during the month of July, approximately a few weeks before July 31, 2012. *Id.* at 21. After closing the Northwest Plaza Property store on July 31, 2012, Sweigart moved inventory and equipment to the Arsenal Road location. *Id.* at 21. He opened the store at Arsenal Road on August 1, 2012, which remained open to the date of the nonjury trial. *Id.* at 21-22. He further testified that he returned to the Northwest Plaza Property on August 5, 2012, with other employees in order to retrieve some fixtures and equipment that had been left behind. *Id.* at 22-23. At that time, the employees affixed signs to the windows of the Northwest Plaza Property that advertised the store's new location at Arsenal Road. *Id.* at 23.

Wainwright also testified. In 2004, Wainwright entered into the Lease on behalf of Atlantic with Reynolds and York for the Northwest Plaza

Property. N.T., 4/13/16, at 32.[7] In early 2012, Wainwright began looking for possible alternative locations for the York store. *Id.* at 34. Wainwright testified that the store at Northwest Plaza was having difficulties, and as a result, he was seeking alternative locations for the York store at the latest in early 2012, and possibly as early as late 2011. *Id.* at 37. Wainwright had negotiated a lease for the Arsenal Road property well in advance of July 2012. *Id.* at 38. In his negotiations with the landlord for the Arsenal Road property, he negotiated a build-out and construction for his cellular phone store. *Id.* at 38-40. Wainwright subsequently executed a lease for the Arsenal Road property. *Id.* at 40.

Wainwright intended to open the store at Arsenal Road on August 1, 2012. N.T., 4/13/16, at 40. Wainwright conceded that the location of the new store was likely no more than two miles from the Northwest Plaza Property location. *Id.* at 40. Wainwright advised his employees to pack and move the inventory from the Northwest Plaza Property to the Arsenal Road location, in order to open the Arsenal Road store on August 1, 2012. *Id.* at 41. Wainwright explained that fixtures from the Northwest Plaza Property store were not necessary for the operation of the new store because the Arsenal Road store was newly built and "there was a whole new fixture

_____

[7] Wainwright explained the corporate interplay of Atlantic and the Wireless Experience. N.T., 4/13/16, at 26-33. Atlantic, however, continued to operate and occupy the Northwest Plaza Property location until the end of July 2012. *Id.* at 33.

package for the new location." *Id.* at 41. Furthermore, Wainwright testified that "the only thing that was necessary was the inventory, as in phones and tablets." *Id.* at 41. Although unable to provide a specific date, Wainwright indicated that he gave his employees notice in advance of July 31, 2012, regarding the directive to pack inventory in anticipation of the move. *Id.* at 41-41. Wainwright never contacted Mr. Reynolds at York to advise him of his plan to move out of the Northwest Plaza Property. *Id.* at 41-42. Wainwright did not contact Reynolds on August 1, 2012, to advise of its move. *Id.* at 42. In fact, Wainwright never contacted York with regard to the lease at the Northwest Plaza Property after August 1, 2012. *Id.* at 42. Wainwright also testified that he never discussed any future plans for the Northwest Plaza Property with Reynolds. *Id.* at 42-43.

With regard to payment on the Lease, Wainwright testified that in August of 2012, he sent a check to the bank used by York, where payments were routinely sent. N.T., 4/13/16, at 44. Wainwright explained that he personally wrote the rent check on behalf of Atlantic under the Lease. *Id.* at 44. The rent check was dated August 10, 2012. *Id.* at 45. Wainwright wrote on the check that the check was void prior to August 10, 2012. *Id.* at 45. On August 10, 2012, Wainwright placed a stop payment on this check through his bank. *Id.* at 45-46. Wainwright did not communicate with Reynolds or York regarding the stop payment. *Id.* at 47. Atlantic did not pay the August rent to York. *Id.* at 48.

In reviewing the evidence, we conclude that the trial court's determination that Atlantic abandoned the Northwest Plaza Property is supported by the record. As noted, during the term of the Lease for the Northwest Plaza property with York, Wainwright negotiated with a different landlord for lease of the Arsenal Road property for purposes of moving the York store. Wainwright had the Arsenal Road store built and the new fixture package included in that property in anticipation of operating the store at that location. Wainwright took these actions well in advance of July 31, 2012. Wainwright subsequently advised his employees at the York store to remove inventory and equipment necessary from the Northwest Plaza Property to open the store at Arsenal Road on August 1, 2012. Employees did as instructed, packing inventory and equipment from the Northwest Plaza Property location on July 30 and 31, 2012, and opened the Arsenal Road location on August 1, 2012. The Northwest Plaza Property location was no longer open for business as of August 1, 2012. As such, the evidence reflects that Atlantic intended to abandon the Northwest Plaza Property, and indeed, carried that intention into effect. **Ferrick**, 69 A.3d at 656.

Atlantic's argument that it intended to utilize the Northwest Plaza Property for another cell phone business lacks credibility, especially in light of Wainwright's testimony that he never discussed any future plans for the Northwest Plaza store with York, and testified that "in my eyes, I didn't see there was any need to make contact." **Id.** at 42. Moreover, the evidence

regarding Wainwright's treatment of the August 2012 rent payment to York established that Atlantic did not pay rent for August of 2012, did not intend to pay rent for August of 2012, and did not intend to pay any further rent on this Lease. Therefore, we conclude that the trial court did not err in determining that Atlantic had abandoned the property.

In its second issue, Atlantic asserts that the trial court erred in failing to find that York evicted it from the Property. Appellant's Brief at 15. Specifically, Atlantic argues that York locked Atlantic out of the Property a day after Atlantic moved inventory from the Property, while Atlantic was current on its rent and while Atlantic's fixtures remained in the property. *Id.* at 16. Atlantic asserts that this action clearly demonstrates York's intent to hold the property adversely to Atlantic. *Id.* at 16. Atlantic also argues that York was obligated by the terms of the Lease to give notice and "an opportunity to cure any alleged breach, and then to initiate eviction or ejectment proceedings before locking the tenant out of the premises." *Id.* at 16-17. Atlantic asserts that York did not give notice nor did it initiate eviction or ejectment proceedings. *Id.* at 17. Atlantic maintains that because York breached the requirements of Paragraph 24 of the Lease, its actions constituted an eviction under Pennsylvania law. *Id.*

What constitutes an eviction under Pennsylvania Law was addressed by the Supreme Court of Pennsylvania in *Kahn v. Bancamerica–Blair Corp.*, 193 A. 905 (Pa. 1937). There, the Court held:

> For the landlord's acts to constitute an "eviction" of the tenant, they must amount to an actual "interference with the tenant's beneficial enjoyment of the demised premises" ... "Eviction, such as will suspend rent, is more than a mere trespass by the lessor ... it is an actual expulsion of the lessee out all or some part of the demised premises."

*Id.* at 906 (internal citations omitted).  The **Kahn** Court went on to explain, however, that:

> It has uniformly been held that where a tenant, during the term, **abandons** the demised premises, the landlord is not bound, under the penalty of loss of his right to receive rent, to permit the tenement to remain wholly unoccupied with the consequent possible or probable loss of his insurance, destruction by waste, or other like injuries.  **The mere fact that he resumes possession is not of itself a sufficient foundation upon which to predicate either an acceptance of a surrender or an eviction.**

*Id.* at 907 (emphasis added).  ***See also Harper & Bro. Co. v. Jackson***, 87 A. 430, 431 (Pa. 1913) ("Where the tenant, not under compulsion, but voluntarily, abandons the premises, there is no eviction."); ***Kull v. Mastbaum & Fleisher***, 12 A. 631, 632 (Pa. 1921) ("In face of the abandonment, clearly no damages could be recovered for the alleged eviction.").

As explained previously, the evidence supports the conclusion that Atlantic abandoned the Northwest Plaza Property.  Thus, the fact that York resumed possession and secured the premises cannot be construed as an eviction.  ***Kahn***, 193 A. at 907.  Atlantic's second claim fails.

In its third issue, Atlantic asserts that the trial court erred in determining that York was entitled to damages "even though no notice or

opportunity to cure any alleged breach under the Lease was afforded to [Atlantic], and [York] elected to evict [Atlantic] in lieu of claiming damages." Atlantic's Brief at 17. Atlantic asserts that it was locked out of the property, that York did not allow Atlantic to cure the alleged breach, and that York never initiated lawful eviction or ejectment proceedings, but unlawfully evicted Atlantic. *Id.* at 18. Therefore, Atlantic argues, York's claim for damages is precluded by its breach of the Lease. *Id.* at 18.

Again, we have concluded that the evidence of record supports the conclusion that Atlantic abandoned the property and that York did not evict Atlantic. Accordingly, we conclude that York was not precluded from claiming and obtaining damages. We will address the specific damages to which York is entitled in discussion of the issues raised by York on its cross-appeal.

Moreover, Atlantic's three remaining issues, calculation of damages, York's obligation to mitigate these damages, and York's efforts to re-let the property, are directly related to those raised by York. Accordingly, we shall address those issues in conjunction with our discussion of the issues raised by York on cross-appeal.

In its cross-appeal at Docket Number 1524 MDA 2016, York presents the following issues for our review:

> I. Did the trial court commit an error of law by determining that York Development Limited Partnership ("York Development") had an obligation to mitigate damages following Atlantic Wireless's breach of commercial lease agreement?

II.     Was there a lack of competent evidence to support the trial court's determination that York Development's efforts to relet the Property were not reasonable or that York Development would have relet the Property within one year had it used alternative efforts?

III.     Did the trial court err as a matter of law in finding no basis for awarding attorneys' fees to York Development?

IV.     Did the trial court err as a matter of law in failing to award York Development liquidated damages for Atlantic Wireless's violation of the contractual non-compete covenant?

V.     Did the trial court err as a matter of law in failing to award prejudgment interest to York Development?

York's Brief at 4.

In its first issue, York argues that the trial court erred when it concluded that York had an obligation to mitigate damages following Atlantic's breach of the Lease. York's Brief at 12-13. In support, York asserts that the law holds that where a tenant abandons property, a non-breaching landlord has no duty to mitigate damages, and cites to **Stonehedge Square Ltd. P'ship v. Movie Merchants, Inc.**, 685 A.2d 1019 (Pa. Super. 1996), and **Ferrick v. Bianchini**, 69 A.3d 642 (Pa. Super. 2013). **Id.** at 12-13. Furthermore, York maintains that while the parties could have modified the general rule through their own contract, they did not do so. **Id.** at 13. Specifically, York asserts that Paragraph 24 of the Lease does not modify this general holding, and that the trial court incorrectly interpreted that paragraph to create a duty to mitigate damages. **Id.** at 14.

- 18 -

Conversely, Atlantic asserts that the trial court correctly determined that York was required to mitigate damages pursuant to Paragraph 24 of the Lease. Atlantic's Brief at 26. Atlantic further argues that **Stonehedge** and **Ferrick** do not apply because Atlantic did not abandon the property. **Id.** at 27.

The evidence supports the conclusion that Atlantic abandoned the property. Thus, we find **Stonehedge** and **Ferrick** apply to this situation. In **Stonehedge**, this Court discussed the state of the law with respect to a commercial landlord's duties following its tenant's breach of lease as follows:

> In **Milling v. Becker**, 96 Pa. 182 (1880), the Supreme Court held "if the relation of landlord and tenant was not ended by contract, he was not bound to rent to another during the term for relief of the defendant." In **Auer v. Penn**, 99 Pa. 370 (1882), the Supreme Court held "the landlord may allow the property to stand idle, and hold the tenant for the entire rent." Finally, in **Ralph v. Deiley**, 293 Pa. 90, 141 A. 640 (1928), the Supreme Court cited **Auer** for the rule that "reletting is not imposed on a landlord as a duty."
>
> * * *
>
> In summary, the Supreme Court has held that a landlord has no duty to mitigate damages, and absent a contrary decision by that Court, it is the duty of this Court and the court of common pleas to adhere to that authority. **Commonwealth v. Buehl**, 540 Pa. 493, 658 A.2d 771 (1995).

**Stonehedge**, 685 A.2d at 1025-1026.

This Court confirmed and reiterated its **Stonehedge** holding in **Ferrick**, as follows:

> Furthermore, where a tenant abandons property, a non-breaching landlord has no duty to mitigate damages.

- 19 -

> ***Stonehedge Square Ltd. Partnership v. Movie Merchants, Inc.***, 552 Pa. 412, 715 A.2d 1082 (1998); ***Trizechahn Gateway, LLC v. Titus***, 930 A.2d 524 (Pa.Super.2007) (rev'd on other grounds 601 Pa. 637, 976 A.2d 474 (2009)); in accord Restatement (Second) of Property, § 12.1, Comment k ("A tenant who abandons leased property is not entitled to insist on action by the landlord to mitigate the damages, absent an agreement otherwise. Abandonment of property is an invitation to vandalism, and the law should not encourage such conduct by putting a duty of mitigation of damages on the landlord."). In the case of abandonment, the landlord may either choose to allow the property to stand idle and hold the tenant liable for the difference, if any.

***Id.*** at 655-656. Because we have determined that Atlantic abandoned the property, we conclude that York, as the landlord, had no duty to mitigate damages. ***Stonehedge; Ferrick***.

Furthermore, we cannot agree with Atlantic's assertion or the trial court's conclusion that Paragraph 24 of the Lease modified this general holding. Paragraph 24 of the Lease provides, in relevant part, as follows:

> the Lessee covenants and agrees, notwithstanding any entry or re-entry by the Lessor whether by summary proceedings, termination or otherwise, to pay and be liable for on the days originally fixed herein for the payment thereof, amounts equal to the several installments of rent and other charges reserved as they would, under the terms of this Lease, become due if this Lease had not been terminated of if the Lessor had not entered or re-entered, as aforesaid, and whether the Demised Premises be relet or remain vacant in whole or in part or for a period less than the remainder of the term, and for the whole thereof, **but in the event the Demised Premises be relet by the Lessor**, the Lessee shall be entitled to a credit in the amount of rent received by the Lessor in reletting after deduction of all expenses incurred in reletting the Demised Premises (including, without limitation, advertising costs and realtor's commissions), and in collecting the rent in connection therewith.

Lease Agreement, 8/12/04, at ¶ 24 (emphasis added).

The trial court provided the following analysis regarding the effect of Paragraph 24 of the Lease:

> Paragraph 24 of the lease requires a duty in the landlord to mitigate damages. Mitigation of damages. Ordinarily in Pennsylvania, when a landlord has no duty to mitigate damages -- at least a commercial landlord – when the tenant abandons a premises where the lease provides the ability of a tenant to mitigate [its] own damages, or implies a requires [sic] the landlord to mitigate damages, then the landlord has that duty.
>
> There is no provision in this lease that would permit tenant to mitigate its own damages. And therefore, we have concluded that the landlord was required to mitigate damages in this case by using reasonable, customary means for mitigating the damages.

Trial Court Opinion, 4/18/16, at 5-6.

We are constrained to disagree with the trial court's conclusion. While the trial court properly acknowledged the general rule that the landlord has no duty to mitigate damages when the tenant abandons a premises, it erred in its conclusion that in this case the landlord was required to mitigate damages pursuant to Paragraph 24 of the Lease.

The language of Paragraph 24 makes clear that the tenant, Atlantic in this case, if no longer present at the property as a result of nonperformance, was responsible for payments as set forth in the Lease Agreement. The language further states that:

> **in the event the Demised Premises be relet by the Lessor**, the Lessee shall be entitled to a credit in the amount of rent received by the Lessor in reletting after deduction of all expenses incurred in reletting the Demised Premises (including, without

limitation, advertising costs and realtor's commissions), and in collecting the rent in connection therewith.

Lease Agreement, 8/12/04, at ¶ 24 (emphasis added).

Thus, there is no duty on the landlord, here York, to re-let the premises or to mitigate the damages. Instead, the language provides that **if** the landlord does re-let the premises, that rent collected from the new tenant would offset the debt owed by the previous tenant, here Atlantic. In other words, it prohibits York from receiving double recovery from payments made by Atlantic under the terms of the Lease and payments made by a new tenant for the same period. As a result, we cannot agree that the parties through Paragraph 24 of the Lease changed the general holding that a landlord has no duty to mitigate damages once a party abandons the property. Thus, we are constrained to reverse the trial court's determination on this issue.

In its second issue on cross-appeal, York argues that the trial court erred in concluding that York's efforts to mitigate damages were inadequate. York's Brief at 4, 15. Specifically, York argues that notwithstanding the fact that York had no duty to mitigate, there was no testimony or evidence produced at trial to support the trial court's conclusion that York's efforts were not reasonable or that other efforts would have resulted in a more expedient re-occupancy of the property. *Id.* at 15.

We previously concluded that York had no obligation to mitigate damages. Thus, we need not undertake consideration of whether York's

efforts in attempting to mitigate damages were sufficient. This issue has no merit.

York's final three issues on cross-appeal relate to the damages to which it is entitled. In discussion of these issues, we will concurrently address Atlantic's related issues raised on appeal.

York asserts that the trial court erred in failing to find a basis for awarding it attorneys' fees. York's Brief at 16. York argues that while under the "American Rule," litigants generally bear their own costs in litigation, including attorneys' fees, a litigant is entitled to recover counsel fees from an adverse party where an express contractual provision provides for such recovery. *Id.* at 17. York posits that the Lease, pursuant to Paragraph 6, provides for recovery of costs resulting from the tenant's failure under the Lease causing those expenditures. *Id.* at 17. York maintains that Atlantic's failure to perform its obligation, specifically to pay rent as required by the Lease, resulted in York's need to hire counsel and initiate legal proceedings, thus resulting in its incurrence of attorneys' fees. *Id.* at 17.

Conversely, Atlantic argues that York is not entitled to any damages "due to its failure to provide the notice and opportunity to cure and its eviction of Atlantic prior to its initiation of eviction or ejectment proceedings." Atlantic's Brief at 21. Additionally, Atlantic argues that even if a claim for attorneys' fees were not completely barred by York's eviction of Atlantic, the Lease provision relied on by York in support of its claim for

attorneys' fees is ambiguous and should be construed against York. *Id.* at 21. Specifically, Atlantic asserts that there is no mention of attorneys' fees in this provision, as would be expected in an attorney fee-shifting clause. *Id.* at 22.

As explained fully above, we have rejected Atlantic's assertion that York is not entitled to any damages due to York's alleged breach of the Lease. Thus, we must consider whether York is entitled to attorneys' fees as part of the damages to which it is entitled.

In addressing a claim for attorneys' fees in the context of the breach of a lease, we have stated:

> The general rule in this Commonwealth is that there is no recovery of attorney's fees from an adverse party in the absence of an express statutory authorization, clear agreement between the parties, or the application of a clear exception. Generally, landlords and tenants can include in a lease any terms and conditions that are not prohibited by statute or other rule of law. The Landlord and Tenant Act of 1951 does not specifically provide for the recovery of attorney's fees nor does it prohibit inclusion of a fee shifting provision in rental agreements. Furthermore, we are not presented with any applicable exceptions to the general rule. Consequently, the validity of the instant provision is solely dependent upon contract law. Where the language of a lease is clear and unequivocal, its meaning will be determined by its contents alone in ascertaining the intent of the parties.

*Bayne v. Smith*, 965 A.2d 265, 267 (Pa. Super. 2009) (internal citations omitted). Our Supreme Court has explained that "Under the American Rule, applicable in Pennsylvania, a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, **a clear**

- 24 -

**agreement of the parties**, or some other established exception."

***Trizechahn***, 976 A.2d at 482-483 (emphasis added).

Thus, the question here is whether there was a clear agreement of the parties to award attorneys' fees to the lessor. We must consider Paragraph 6 of the Lease to determine if it is ambiguous.

> "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." ***Insurance Adjustment Bureau v. Allstate***, 588 Pa. 470, 481, 905 A.2d 462, 468–69 (2006). The "reasonably" qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable. ***See Murphy v. Duquesne Univ. Of The Holy Ghost***, 565 Pa. 571, 591, 777 A.2d 418, 430 (2001) ("[C]ontractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." (emphasis added)). Furthermore, reviewing courts will not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." ***Madison Constr. Co. v. Harleysville Mut. Ins. Co.***, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999). Finally, while ambiguous writings are interpreted by the finder of fact, unambiguous ones are construed by the court as a matter of law. ***See Kripp v. Kripp***, 578 Pa. 82, 91, 849 A.2d 1159, 1163 (2004).

***Trizechahn***, 976 A.2d at 653.

Paragraph 6 of the Lease provides as follows:

> 6. **ADDITIONAL RENT:** In addition to the foregoing minimum rent, all other payments to be made by Lessee, either to Lessor or the Merchant's Association, shall be deemed to be and shall become additional rent hereunder, whether or not the same be designated as such; and shall be due and payable on demand or together with the next succeeding installment of rent, whichever shall first occur; and Lessor shall have the same remedies for failure to pay the same as for a non-payment of rent. Lessor, at his election, shall have the right to pay or do any act which requires the expenditure of any sums of money by reason of the failure or neglect of Lessee to perform any of the

provisions of this Lease, and in the event Lessor shall at his election pay such sums or do such acts requiring the expenditure of monies, Lessee agrees to pay Lessor, upon demand, all such sums, and the sum so paid by Lessor, together with interest thereon, shall be deemed additional rent and be payable as such.

Lease Agreement, 8/12/04, at ¶ 6.

In reviewing Paragraph 6, we are compelled to conclude that the paragraph is ambiguous regarding the damages that York may recover under it because it is reasonably susceptible to different constructions and capable of being understood in more than one sense. *Trizechahn*, 976 A.2d at 482-483. The heading "ADDITIONAL RENT" leads to ambiguity of damages recoverable under this paragraph, notwithstanding the additional statement that damages under this provision shall be considered additional rent "whether or not the same be designated as such." *Id.* Moreover, there is no reference to the hiring of counsel or recovery of those related costs. Thus, we cannot agree that this provision **clearly** reflects agreement between the parties for payment of attorneys' fees. *Trizechahn*, 976 A.2d at 482-483. *See also Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022, 1032 n. 11 (Pa. Super. 2005) ("There can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception."). Accordingly, the trial court did not err in declining to award York attorneys' fees.

York next argues that the trial court erred as a matter of law in failing to award it liquidated damages as a result of Atlantic's violation of the contractual non-compete covenant pursuant to Paragraph 13 of the Lease. York's Brief at 4, 18. York asserts that the trial court found that Atlantic breached the Competition clause, yet without explanation, refused to provide for the increased minimum rent in its damages award. *Id.* at 18. York maintains that the liquidated damages clause is not a penalty and is a reasonable remedy given the difficulty associated with calculating precise damages associated with a breach of the Competition clause, along with the certainty of some level of associated harm resulting from such a breach. *Id.* at 19. Accordingly, York posits it is entitled to a fifty percent premium on the rent due after Atlantic opened the Arsenal Road store. *Id.* at 19.

Atlantic conversely maintains that York is not entitled to liquidated damages due to its failure to provide the notice and opportunity to cure as required under the Lease and its eviction of Atlantic. Atlantic's Brief at 24. According to Atlantic, even if York had not evicted Atlantic, the liquidated damages clause in Paragraph 13 of the Lease amounts to an unlawful penalty rather than a reasonable approximation of any expected loss to York. *Id*.

In addressing liquidated damages, our Supreme Court has provided the following explanation:

> Liquidated damages is a term of art originally derived from contract law; it denotes the sum a party to a contract agrees to

pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is legally recoverable ... if the breach occurs. A penalty, by contrast, is fixed, not as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach. Thus, contracting parties may provide for pre-determined liquidated damages in the event one party fails to perform, particularly in circumstances where actual damages would be difficult to estimate in advance or to prove after a breach occurs. *See* Restatement (Second) of Contracts, § 356(1)("Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss[;] [a] term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty."). *See generally Geisinger Clinic v. Di Cuccio*, 414 Pa.Super. 85, 99, 606 A.2d 509, 516 (1992)(listing criteria to differentiate liquidated damages from penalties).

*Pantuso Motors, Inc. v. Corestates Bank, N.A.*, 798 A.2d 1277, 1282

(Pa. 2002) (some internal citations and quotation marks omitted).

In *Geisinger Clinic*, this Court explained:

this court, . . . in *Holt's Cigar Co. v. 222 Liberty Associates*, 404 Pa.Super. 578, 591 A.2d 743 (1991), held that the lynchpin of a liquidated damage clause is compensation for damages sustained. The court further observed that a provision which represents a good-faith and reasonable forecast of anticipated damages for breach which are otherwise difficult to prove with certainty will be construed as one for liquidated damages rather than for punishment or to secure compliance. This court characterized liquidated damages as a measure of foreseeable business losses or as damages for loss of good will. If no measure of compensation is intended, the damages clause is a penalty to secure compliance. *Id.* In that case, we reiterated the factors to which we must look in deciding whether the damages are liquidated or for penalty:

> The question of whether stipulation is a penalty or a valid liquidated damages provision ... is to be determined by the intention of the parties, drawn

- 28 -

from the words of the whole contract, examined in the light of its subject-matter and its surroundings; and in this examination we must consider the relation which the sum stipulated bears to the extent of the injury which may be caused by the several breaches provided against, the ease or difficulty of measuring a breach in damages, and such other matters as are legally or necessarily inherent in the transaction.

404 Pa. Superior Ct. at 587, 591 A.2d at 747[.]

*Geisinger Clinic*, 606 A.2d at 517. *See also Palmieri v. Partridge*, 853 A.2d 1076, 1080 (Pa. Super. 2004) ("A liquidated damages clause that is tantamount to a penalty is unenforceable. To be enforceable, liquidated damages must be a reasonable forecast of the possible harm to the non-breaching party.")

Paragraph 13 of the Lease provides:

13. **COMPETITION:** Lessee shall not open or operate another store for business in any similar or competing business within a circle, the radius of which is three (3) miles, the center of which shall be the Shopping Center. Lessor, for breach of this covenant and in addition to any other remedy otherwise available, may increase the minimum rent payable then and in the future by fifty (50%) percent. The above paragraph shall not apply to any Cingular store or dealership which is not owned or operated by Atlantic Wireless Group, Inc. or any of its principal shareholders which own five (5) percent of its stock.

Lease Agreement, 8/12/04, at ¶ 13.

The trial court found that Atlantic "mov[ed] the business to a location within three miles of the lease premises, advertising the new location on the premises of the leased premise at Northwest Plaza." Trial Court Opinion, 4/18/16, at 4. Thus, the trial court determined that Atlantic breached the

non-compete clause. Despite concluding that Atlantic violated the non-compete clause, however, the trial court failed to make a determination regarding Paragraph 13 of the Lease as it relates to liquidated damages.

Ordinarily if a trial court has failed to address an issue raised in a Pa.R.A.P. 1925(b) statement,[8] the remedy is "a remand to the trial court with directions that an opinion be prepared and returned to the appellate court." *Scampone v. Grane Healthcare Co.*, 11 A.3d 967, 974 (Pa. Super. 2010). Remand is unnecessary, however, if the lack of an opinion does not impact upon our ability to conduct appellate review. *Id.* Here, the trial court's failure to address this issue impacts our ability to conduct appellate review, especially in light of the analysis necessary to determine the enforceability of a liquated damages claim. Thus, we direct the trial court to address York's claim for liquidated damages on remand.

York next argues that it was entitled to prejudgment interest. York maintains that in Pennsylvania, the nonbreaching party to a contract is entitled to recover pre-judgment interest on the amount due under the contract. York's Brief at 20. Thus, it asserts that its entitlement to pre-judgment interest is not subject to the trial court's discretion. *Id.* York argues that the trial court, without comment, erred in failing to award York

---

[8] As noted previously, York raised this issue in its Pa.R.A.P. 1925(b) statement. York's Concise Statement of Errors Complained of on Appeal, 11/2/16, at ¶ 5.

prejudgment interest. *Id.* Conversely, Atlantic maintains that York is not entitled to damages, including prejudgment interest, because Atlantic was not in breach of the Lease. Atlantic's Brief at 25.

In addressing the issue of pre-judgment interest, this Court has explained:

> "a court has discretion to award or not award prejudgment interest on some claims, but must or must not award prejudgment interest on others." The Restatement (Second) of Contracts § 354, which Pennsylvania follows, reflects this discretion:
>
> > (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.
> >
> > (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.
>
> Restatement (Second) of Contracts § 354(1)-(2) (1981). Thus, before awarding prejudgment interest, the court must identify the nature of the breach. *See id.*

*Cresci Const. Services, Inc. v. Martin*, 64 A.3d 254, 258-259 (Pa. Super. 2013) (some internal citations omitted). Thus, pursuant to the Restatement (Second) of Contracts § 354(1), prejudgment interest is a matter of right where the amount is ascertainable from the contract. *Ely v. Susquehanna Aquacultures, Inc.*, 130 A.3d 6, 15 (Pa. Super. 2015). Where the amount

due and owing is not sufficiently definite, prejudgment interest is awardable at the discretion of the trial court. *Id.*

Herein, the trial court did not award York pre-judgment interest, but failed to provide any explanation for its determination. Indeed, the trial court failed to address this issue despite the fact that York had raised it in its Pa.R.A.P. 1925(b) statement. York's Concise Statement of Errors Complained of on Appeal, 11/2/16, at ¶ 6. The trial court's failure to address this issue hampers our ability to conduct appellate review. *Scampone*, 11 A.3d at 974. Accordingly, we direct the trial court to address York's claim for prejudgment interest on remand.

Finally, we address Atlantic's claim that the trial court mistakenly found that York was entitled to $110,719.99 in damages. Atlantic's Brief at 25. Atlantic maintains that if York was entitled to damages, the total damages should be $84,718.41. *Id.* Atlantic asserts that the trial court's incorrect calculation resulted from a simple mathematical error. *Id.* According to Atlantic, the trial court erroneously counted August of 2012 through December of 2012, as eight months rather than five, resulting in the incorrect calculation of damages. *Id.* at 25-26.

In outlining its damages calculation, the trial court stated the following:

> With regard to the amount of rent that we have awarded to [York], we base that rent on a reasonable period of time for the landlord to re-lease the premises and mitigate the damages which we determined to be through August of 2013.

- 32 -

The calculation of rent was $6,634.17 from August of 2012 through December of [2012]. The evidence indicated that it was in January of each year when the rent was increased. We also awarded rent of $6,833.20 from January of 2013 through July of 2013. The first amount from August through December we calculated from August of 2012 through December of [2012] to be $53,073.30. From January of 2013 through July of 2013, we calculated that amount to be $47,832.40.

We believe that one year would be sufficient for the landlord to re-lease the premises if the landlord used reasonable, ordinary, and the type of efforts that is normally used in the industry of commercial shopping center leasing. The total rent, therefore, was $100,905.70 with late fees of $5,045.29.

We also considered that the reasonable repairs for the damages done by the tenant in removing fixtures and necessary [to] restore the premises to [its] original condition, reasonable wear and tear excepted, would be the $4,769 paid by the landlord.

Therefore, we reach the total judgment amount entered of $110,719.99. With regard to taxes, insurance and utilities, we find that there was not sufficient specific testimony to permit the [c]ourt to enter an order based on the evidence that was presented. We also find no basis for awarding attorney's fees.

Trial Court Opinion, 4/18/16, at 6-7.

While it indeed appears that the trial court mistakenly concluded that August of 2012 through December of 2012 constituted eight months instead of five, resulting in a miscalculation of rent damages, this mathematical error is of no consequence. The trial court's calculation of rent damages was based on its conclusion that York had an obligation to mitigate its damages and its determination that York should have been able to re-let the premises within one year. As explained previously, York had no obligation to mitigate

J-A11006-17

its damages. Thus, York was not limited to rent damages for only one year as determined by the trial court.

Instead, York was entitled to rent damages for the remainder of the Lease, with the exception of the months that York was able to re-let the premises. Thus, the trial court's calculation of damages, specifically based on damages for rent through July of 2013, was incorrect. York was entitled to rent payments from Atlantic through the end of the Lease, August of 2014, to the extent that York did not re-let the Property. Thus, despite the mathematical error in calculating rent damages for 2012, the trial court must undertake a new determination regarding damages based on rent payments due York through the end of the Lease.

Accordingly, we affirm with respect to the appeal at Docket Number 1519 MDA 2016, and reverse with respect to the cross-appeal at Docket Number 1524 MDA 2016, as outlined in this Memorandum. We remand this matter to the trial court for a determination of damages owed to York consistent with this Memorandum, specifically with regard to liquidated damages, pre-judgment interest and rent damages.

Judgment affirmed in part, reversed in part. Case remanded. Jurisdiction relinquished.

- 34 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/2/2017</u>